1  Sara B. Brody, SBN 130222
   sbrody@sidley.com
2  Jaime A. Bartlett, SBN 251825
   jbartlett@sidley.com
3  Sarah A. Hemmendinger, SBN 298659
   shemmendinger@sidley.com
4  SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
5  San Francisco, California  94104
   Telephone:  (415) 772-1200
6  Facsimile:  (415) 772-7400

7  Norman J. Blears, SBN 95600
   nblears@sidley.com
8  SIDLEY AUSTIN LLP
   1001 Page Mill Road, Building 1
9  Palo Alto, California  94304
   Telephone:     (650) 565-7000
10 Facsimile:     (650) 565-7100

11 Robin Wechkin (*pro hac vice* app. to be submitted)
   rwechkin@sidley.com
12 SIDLEY AUSTIN LLP
   701 Fifth Avenue, Suite 4200
13 Seattle, Washington 98104
   Telephone:  (206) 262-7680

14
   Attorneys for SunEdison, Inc., Ahmad Chatila,
15 Brian Wuebbels, Martin Truong,
   Emmanuel Hernandez, Antonio R. Alvarez,
16 Clayton Daley, Jr., Georganne Proctor,
   Steven Tesoriere, James B. Williams, Randy H. Zwirn
17
   [Additional Counsel and Representations Listed on Signature Pages]
18
                 **UNITED STATES DISTRICT COURT**
19
                 **NORTHERN DISTRICT OF CALIFORNIA**
20
                 **SAN FRANCISCO DIVISION**
21
   COBALT PARTNERS, LP, COBALT          Case No. 3:16-cv-02263-WHA
22 PARTNERS II, LP, COBALT OFFSHORE
   MASTER FUND, LP and COBALT KC        **INDIVIDUAL DEFENDANTS'**
23 PARTNERS, LP,                        **NOTICE OF MOTION AND MOTION**
                                        **TO DISMISS PLAINTIFFS'**
24              Plaintiffs,             **COMPLAINT; MEMORANDUM OF**
                                        **POINTS AND AUTHORITIES**
25        vs.
                                        Hon. William H. Alsup
26 SUNEDISON, INC., AHMAD CHATILA,
   BRIAN WUEBBELS, MARTIN TRUONG,       Date:       August 18, 2016
27 ALEJANDRO HERNANDEZ, EMMANUEL        Time:       8:00 a.m.
                                        Courtroom:  Courtroom 8, 19th Floor
28

1
2
3
4
5
6
7
8
9

HERNANDEZ, ANTONIO R. ALVAREZ,
PETER BLACKMORE, CLAYTON DALEY
JR., GEORGANNE PROCTOR, STEVEN
TESORIERE, JAMES B. WILLIAMS, RANDY
H. ZWIRN, GOLDMAN, SACHS & CO., J.P.
MORGAN SECURITIES LLC, MORGAN
STANLEY & CO. LLC, MERRILL LYNCH,
PIERCE, FENNER & SMITH
INCORPORATED, DEUTSCHE BANK
SECURITIES INC., MACQUARIE CAPITAL
(USA), INC., MCS CAPITAL MARKETS LLC
and DOES 1- 25, inclusive,

Defendants.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 18, 2016, or as soon thereafter as the matter may be heard, before the Honorable William H. Alsup, U.S. District Court Judge, Defendants Ahmad Chatila, Brian Wuebbels, Martin Truong, Peter Blackmore, Emmanuel Hernandez, Antonio R. Alvarez, Clayton Daley, Jr., Georganne Proctor, Steven Tesoriere, James B. Williams, and Randy H. Zwirn (collectively, the Individual Defendants) will and hereby do move this Court for an order dismissing the complaint in this case.

The Individual Defendants move for dismissal under Fed. R. Civ. P. 12(b)(6), on the ground that Plaintiffs have failed to state a claim on which relief may be granted.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Request for Judicial Notice and attached exhibits, the pleadings and papers on file in this action, and such arguments and authorities as may be presented to the Court at or before the time of the hearing on this motion.

1

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

1   Dated:  May 20, 2016                     Respectfully Submitted,

2

3                                     By:    /s/ Sara B. Brody
                                            Sara B. Brody, SBN 130222
4

5                                            SIDLEY AUSTIN LLP
                                            555 California Street, Suite 2000
6                                            San Francisco, California  94104
                                            Telephone:  (415) 772-1200
7                                            Facsimile:  (415) 772-7400
                                            sbrody@sidley.com
8
                                            *Attorneys for SunEdison, Inc., Ahmad*
9                                            *Chatila, Brian Wuebbels, Martin Truong,*
                                            *Emmanuel Hernandez, Antonio R. Alvarez,*
10                                           *Clayton Daley, Jr., Georganne Proctor,*
                                            *Steven Tesoriere, James B. Williams, and*
11                                           *Randy H. Zwirn*

12

13                                    By:    /s/ Brett Hammon
                                            Brett Hammon, SBN 288325
14

15                                           WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
16                                           950 Page Mill Road
                                            Palo Alto, California 94304
17                                           Telephone: (650) 858-6000
                                            Facsimile (650) 858-6100
18                                           Brett.Hammon@wilmerhale.com

19                                           Michael Bongiorno (admitted *pro hac vice*)
                                            Timothy Perla (admitted *pro hac vice*)
20                                           WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
21                                           60 State Street
                                            Boston, Massachusetts 02109
22                                           Telephone: (617) 526-6000
                                            Facsimile (617) 526-5000
23                                           Michael.Bongiorno@wilmerhale.com
                                            Timothy.Perla@wilmerhale.com
24

25                                           *Attorneys for Peter Blackmore*

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   BACKGROUND .................................................................................................... 2

III.  ARGUMENT ......................................................................................................... 5

    A.    Plaintiffs' Claims Fail In Their Entirety. ................................................... 5

        1.    The Allegedly Omitted Information Was Largely Disclosed. ......................... 5

        2.    Defendants Had No Ability To Disclose The Allegedly Missing Facts In The Q2 2015 Form 10-Q Incorporated By Reference Into The Prospectus. ..................................................................................... 11

        3.    Plaintiffs Plead No Facts Showing That The Challenged Statements Made Elsewhere In The Prospectus Were Materially False Or Misleading By Way Of Omission. .................................................. 12

        4.    Plaintiffs Have Not Pled A Violation Of Regulation S-K. ........................... 15

    B.    The Majority Of The Allegedly False Or Misleading Statements Are Inactionable As A Matter Of Law. .................................................... 16

        1.    Statements Outside The Four Corners Of The Offering Documents ............ 16

        2.    Statements Within The Offering Documents. ................................................. 17

    C.    Plaintiffs' Section 12(a)(2) Claim Against The Individual Defendants Fails As A Matter Of Law. ............................................................................ 20

IV.  CONCLUSION ................................................................................................... 22

i

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................................................5

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
    2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .................................................................15

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002) .........................................................................................6

*In re Cutera Sec. Litig.,*
    610 F.3d 1103 (9th Cir. 2010) .....................................................................................20

*In re Daou Sys. Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005) ................................................................................ 20-21

*Firefighters Pension & Relief Fund of New Orleans v. Bulmahn,*
    53 F. Supp. 3d 882, 897 (E.D. La. 2014) ................................................................6, 11

*Fouad v. Isilon Sys., Inc.*,
    2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) .......................................................21

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995).......................................................................................................16

*In re Glenfed, Inc., Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) (en banc) ........................................................................9

*J&R Mrktg., SEP v. Gen. Motors Corp.*,
    549 F.3d 384 (6th Cir. 2008) .......................................................................................15

*Krim v. Coastal Physician Grp., Inc.*,
    81 F. Supp. 2d 621 (M.D.N.C. 1998) ..........................................................................10

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) ..............................................................21

*In re Metricom Sec. Litig.*,
    2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ..............................................................16

*In re Molycorp, Inc. Sec. Litig.*,
    _ F. Supp. 3d _, 2016 WL 233402 (D. Colo. Jan. 29, 2016) ....................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015)..........................................................................6, 12, 13, 15, 19

ii

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

*Pinter v. Dahl*,
    486 U.S. 622 (1988)....................................................................................20, 21

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................ 16-17

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ............................................................................21

*Rubke v. Capitol Bancorp, Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .......................................................................6, 13

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ...........................................................................18

*In re Stone & Webster, Inc. Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003) ..............................................................10

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    683 F. Supp. 2d 1236 (D.N.M. 2010) .................................................................7

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    695 F. Supp. 2d 1165 (D.N.M. 2010) .........................................................16, 21

*In re Velti PLC Sec. Litig.*,
    2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)................................................15, 19

*In re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)..............................................18, 21

*In re Worlds of Wonder, Inc. Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .........................................................................7, 18

**Statutes**

11 U.S.C. §§ 101 *et seq.* (Chapter 11 of the Bankruptcy Code)........................................1

15 U.S.C. § 77k (Section 11 of the Securities Act) .............................................5, 16

15 U.S.C. § 77*l*(a)(2) (Section 12(a)(2) of the Securities Act)...............................5, 16, 20

15 U.S.C. § 77o (Section 15 of the Securities Act) ................................................5

**Regulations**

17 C.F.R. pt. 229 ............................................................................................3

17 C.F.R. § 229.303 ......................................................................................15

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This is one of many overlapping cases brought by disappointed purchasers of securities issued by SunEdison, Inc. (Sun Edison or the Company) and its partially-owned subsidiary, TerraForm Global, Inc. (Global).  SunEdison is a renewable energy development company; it finances, builds and operates solar, wind and hydro power plants around the globe.  SunEdison has two partially-owned subsidiaries known as "yieldcos" – companies created to purchase and own certain renewable energy projects developed by the parent company.  The projects purchased by a yieldco generate revenue as power is sold to customers, and a portion of that revenue is returned to the yieldco's investors in the form of dividends.  The first of SunEdison's yieldcos, TerraForm Power, Inc. (TERP) became a publicly traded company in 2014.  The second, Global, held its IPO on July 31, 2015.

Some of the litigation against SunEdison and Global, including litigation in this Court, is based on the Global IPO.  Other cases, of which the present lawsuit is one, are based on investors' purchases of Global, SunEdison, or related parties' securities in other offerings between June and August 2015.  Plaintiffs in this case target a single such offering:  the public offering of SunEdison preferred stock, which took place on August 18, 2015 (the Preferred Stock Offering).  Plaintiffs have sued SunEdison, twelve individuals who serve (or served) as officers or directors at SunEdison or Global, and seven underwriters of the Preferred Stock Offering.

On April 21, 2016, SunEdison filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; the bankruptcy case is pending in the Southern District of New York.  As a result, this action is stayed as to SunEdison but remains ongoing against all other defendants.  This motion is made by the eleven current or former officer or directors of SunEdison listed in the Notice of Motion section above (the Individual Defendants).  A twelfth defendant, Alejandro Hernandez, will file a separate motion joining in this motion and raising specific jurisdictional and pleading issues.

The Court should dismiss Plaintiffs' claims in their entirety.  Plaintiffs rely principally on an omission theory, in which they allege that Defendants failed to disclose pertinent details relating to

two loan transactions, as well as the general status of SunEdison's liquidity.  The record before the Court, however, shows that the relevant facts largely *were* disclosed.  The pertinent loan terms were part of the public record well before Plaintiffs made their investments; meanwhile, the allegedly omitted facts related to liquidity were set forth in detail in the Company's financial statements and narrative descriptions of relevant transactions.  Even in the absence of such disclosures, moreover, Plaintiffs could not state an omission claim merely by alleging that purportedly material information should have been disclosed.  Plaintiffs must show that affirmative statements in the offering documents were rendered *misleading* – not just incomplete, but misleading – as a result of the alleged nondisclosure.  The facts Plaintiffs have pled, even taken as true, do not meet that standard.

Plaintiffs' claims additionally fail on purely chronological grounds.  The information Plaintiffs say Defendants should have disclosed had not yet even come into existence at the time of the statements made in the quarterly filing Plaintiffs challenge.  Plaintiffs' claims also fail with respect to statements outside the four corners of the offering documents, and with respect to statements that are inactionable forecasts or opinions.  Finally, Plaintiffs' Section 12(a)(2) claim fails because the Individual Defendants are not statutory sellers and hence not among the parties against whom a Section 12(a)(2) claim may lie.

## II.    BACKGROUND

On August 18, 2015, SunEdison conducted the Preferred Stock Offering.  Because this was a public offering, the Company registered the stock with the SEC.  The Company also filed a Prospectus Supplement, which included and incorporated by reference an earlier Prospectus dated September 9, 2013 (we refer to the combined document hereafter as the Prospectus).  Ex. A.[1]  The Prospectus was highly detailed; it contained, among other things, a description of the securities, a broad-ranging discussion of the Company, its business and its yieldcos, and a thorough analysis of the risks relevant both to investments in SunEdison's preferred stock in particular and to investments in the Company generally.  *E.g.*, *id.* at S-1 through S-13, S-19 through S-30, iv-v, 1-3.  The Prospectus incorporated by reference several of SunEdison's previous SEC filings, including

---

[1] All "Ex. _" citations in this brief refer to the exhibits to the Individual Defendants' Request for Judicial Notice filed herewith.

2

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

1   its most recent Form 10-Q, for the quarter ended June 30, 2015.  *Id.* at S-iii through S-iv, ii-iii.

2   Both the incorporated Form 10-Q and the Prospectus itself included financial statements whose

3   accuracy Plaintiffs do not seriously challenge.  *Id.*

4         The contents of the prospectus for a public stock offering, along with contents of the related

5   registration statement, are tightly regulated, principally under SEC Regulation S-K.  17 C.F.R.

6   pt. 229.  Regulation S-K contains scores of rules governing the information that must be provided in

7   a registration statement and statutory prospectus, as well as copious instructions further detailing

8   what issuers must disclose; all are aimed at ensuring that investors are materially informed about

9   the securities they are purchasing and the issuer's business.  Plaintiffs here do not contend, save

10  possibly in a single glancing instance, that SunEdison failed to provide the information required by

11  Regulation S-K.[2]

12        Instead, Plaintiffs' theory is that certain statements in the Prospectus were misleading by way

13  of omission.  The allegedly omitted information relates to:

14       •     Certain terms in a $410 million margin loan agreement that a subsidiary of
15             SunEdison entered into in January 2015 (the Margin Loan).  According to Plaintiffs,
               debt covenants in the loan agreement were triggered on August 7, 2015, and this
16             purported breach was "imminent" at an even earlier point.

         •     The adequacy of SunEdison's liquidity, both for purposes of its own business and for
17             purposes of acquiring assets to sell to Global.

18       •     A loan agreement SunEdison entered into on August 11, 2015 (the August 2015
               Loan).
19
    *E.g.*, Complaint (Com.) ¶¶ 3, 121.
20
          What the Prospectus and other public filings show, however, is that the bulk of what
21
    Plaintiffs say was concealed was in fact disclosed.  With respect to the Margin Loan, SunEdison
22
    disclosed in its Forms 10-Q for both Q1 and Q2 2015 the facts that (1) the amount of the loan was
23
    $410 million; (2) the loan was secured by SunEdison's holdings of stock in its yieldco TERP; (3)
24
    SunEdison was required to maintain a value to loan ratio of 2:1 (meaning that the value of the
25
    security had to be equal to at least $820 million); (4) if the value of the security fell below that
26
    amount, SunEdison would be required to post cash collateral or repay the loan in whole or in part;
27

---

[2] We discuss that instance on page 15 below.

28

3

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

1   and (5) other events related to price and liquidity of TERP stock could also cause SunEdison to be

2   required to repay the loan in whole or in part.  Com. ¶ 127; Ex. B at 22; Ex. C at 25.  As we show

3   further below, SunEdison also disclosed additional information that Plaintiffs contend was missing –

4   the number of TERP shares that constituted security for the loan.

5        The record also shows that SunEdison made copious disclosures about its liquidity.  The

6   Prospectus included financial statements, the accuracy of which, again, Plaintiffs do not seriously

7   challenge.  Ex. A at S-iii through S-iv, S-14 through S-18; Ex. B at 8-58.  The Prospectus and

8   incorporated documents also contained narrative descriptions of the transactions bearing on

9   SunEdison's liquidity, including transactions post-dating the periods covered by the financial

10  statements.  Ex. A at S-2 through S-6.  And the Prospectus included detailed cautionary statements

11  warning investors of risks to the Company's liquidity.  *Id.* at S-19 through S-27.

12       Finally, SunEdison disclosed the August 2015 Loan in its first periodic SEC filing

13  post-dating the transaction, its Form 10-Q for Q3 2015.  Ex. D at 34.  Plaintiffs complain that this

14  was not enough; they say that SunEdison should not have waited until filing its Form 10-Q but

15  instead should have described the loan in the Prospectus.  As we discuss below, however, Plaintiffs

16  have pled no facts showing that the alleged omission rendered any affirmative statement in the

17  offering materials misleading – which is the bedrock requirement of a claim under Section 11 or

18  Section 12(a)(2).  Nor have Plaintiffs pled facts showing that the loan was material in the context of

19  SunEdison's overall disclosed indebtedness at the time of the offering – and materiality is also a

20  required element of their claims.

21       It is worth noting here that a good deal of Plaintiffs' complaint is devoted to statements that

22  were made and events that occurred *after* the Preferred Stock Offering was conducted on August 18,

23  2015.  *E.g.*, Com. ¶¶ 84-108.  Among other things, Plaintiffs focus on November 2015, and they

24  accuse SunEdison of undertaking a series of corporate maneuvers on November 20 in which the

25  Company is supposed to have sacrificed the interests of one of its yieldcos in order to repay part of

26  the Margin Loan.  *Id.* ¶¶ 99-101.  None of this is remotely relevant to the present case.  As a matter

27  of law, Plaintiffs' Securities Act claims are limited to allegedly false or misleading statements made

28  in a prospectus or registration statement.  *See* pages 16-17 below.  As significantly, events that

occurred months after the offering are not relevant to the question posed by this motion – whether Plaintiffs have satisfied their burden of plausibly alleging false or misleading statements in the offering documents.  Plaintiffs may be unhappy with the way SunEdison and its yieldcos conducted their businesses in November 2015; Plaintiffs may disagree with the way in which the interrelated companies acted with respect to one another.  Indeed, in litigation outside this Court, issues relating to the rights and obligations of the parent and the two yieldcos vis-à-vis one another have a central role.  But none of that has any bearing on the issues in this case or on this motion.  The question here is whether Plaintiffs have adequately pled that statements in the Prospectus were false or misleading *as of August 18, 2015*.  As we show below, Plaintiffs have not pled such facts.  The rest is a distraction.

## III.   ARGUMENT

Plaintiffs seek to assert claims under Sections 11, 12(a)(2) and 15 of the Securities Act. 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o.  For the reasons discussed in Section A below, the Court should dismiss Plaintiffs' claims in their entirety because Plaintiffs have failed to allege facts plausibly supporting a claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  For the reasons set forth in Sections B and C, certain claims and portions of claims also fail because the challenged statements are inactionable, because Plaintiffs have not pled the facts necessary to satisfy the statutory elements of a Securities Act claim, or both.

### A.      Plaintiffs' Claims Fail In Their Entirety.

#### 1.      The Allegedly Omitted Information Was Largely Disclosed.

The crux of Plaintiffs' claims is that Defendants violated the securities laws by omitting from the Prospectus material information about the January 2015 Margin Loan, the August 2015 Loan, and SunEdison's liquidity.  It is important to understand at the outset that there is no generalized duty under the Securities Act for issuers or other parties to disclose all material information.  Under the Securities Act, the omission of material information is actionable *only if* (1) defendants have an independent duty to disclose imposed by statute or regulation, or (2) an affirmative statement contained in a registration statement or prospectus is rendered misleading by virtue of the omitted information.  15 U.S.C. § 77k, § 77*l*(a)(2).  As the Supreme Court has recently emphasized,

5

"Section 11's omissions clause . . . is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015). Thus, "Section 11 does not require the disclosure of all information a potential investor might take into account when making [his or her] decision." *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009). Liability attaches under Sections 11 and 12(a)(2) only when an issuer's affirmative statements are *misleading or untrue* – not simply when they are *incomplete*. *Id.* at 1162 (citing *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also*, *e.g.*, *Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 897 (E.D. La. 2014) (under Section 11, "there is no general duty to disclose all material, non-public information")). We return to this significant limitation on Securities Act liability at pages 12-14 below. First, however, we discuss an even more fundamental problem with Plaintiffs' claims: The allegedly omitted information was largely disclosed.

*The facts relating to the Margin Loan were disclosed.* As noted, SunEdison appropriately disclosed the facts relating to the Margin Loan after entering into the Margin Loan Agreement. In its Form 10-Q for Q1 2015 filed May 7, 2015, the Company informed investors of the critical terms of the loan: (1) the loan was secured by SunEdison's holdings of TERP Class B stock; (2) the value of TERP Class B stock was determined by the market price of TERP Class A stock; (3) if the value of the TERP Class B security for the loan fell below twice the $410 million loan amount, SunEdison would be required to post cash collateral or repay all or a portion of the loan; and (4) if other events related to the price and liquidity of TERP stock occurred, SunEdison would also be required to repay the loan in whole or in part. Com. ¶ 127; Ex. B at 22. With this information in hand, investors were at all times aware of the risks attendant on the Margin Loan: They knew that if the trading price of TERP stock fell, SunEdison would risk being required to post collateral or repay the loan. And the trading price of TERP stock, of course, was a matter of public record.

Plaintiffs complain that these disclosures were insufficient. They say that SunEdison should also have disclosed the details that would have enabled investors to tell at precisely which stock

6

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-cv-02263-WHA

price, and on precisely which day, a triggering event would occur.  Com. ¶ 54.  This claim fails for several reasons.

First, as a matter of law, "failure to disclose a contract provision, without [an allegation by plaintiffs] that the provision is unique, cannot constitute a material omission."  *In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1257 (D.N.M. 2010).  This is so because contracts of the kind a public company enters into typically will "contain dozens – if not hundreds – of individual provisions, any one of which might be crucial depending upon what facts transpire."  *Id.*  Plaintiffs here allege in essence that because, under their current calculations, a triggering event led to a margin call on August 7, 2015, SunEdison should have disclosed all loan terms relating to such events, and should have done so even before the alleged event occurred.  But courts have long rejected the use of such hindsight-driven reasoning as the basis for an omission claim under the securities laws.  *Id.* at 1258 (rejecting the claim that because a common but undisclosed contract provision "was eventually triggered, the provision . . . should have been disclosed"); *see also*, *e.g.*, *In re Worlds of Wonder, Inc. Sec. Litig.*, 35 F.3d 1407, 1420-21 (9th Cir. 1994) (rejecting hindsight-based allegations in Securities Act case).  Indeed, the *Thornburg* court found "no authority for the proposition that a company is subject to Section 11 or 12(a)(2) liability for failure to disclose the entire content of its contracts."  683 F. Supp. 2d at 1258.  We are not aware of any such authority either.  The Court should reject Plaintiffs' reverse-engineered contention that the Individual Defendants may be held liable for purportedly failing to disclose each and every term of the Margin Loan agreement.

Plaintiffs' claim that SunEdison was required to disclose every detail relating to triggering events is not only wrong as a legal matter, it also fails for practical reasons.  If an issuer disclosed to the market precisely the stock price that would trigger a margin call, any market participant could seek to influence the stock price – to drive it down, and to cause a margin call – for reasons benefiting himself or herself alone, and to the detriment of the issuer and its long-term investors.  Disclosures of the kind Plaintiffs insist on here create incentives for market participants to manipulate events in undesirable ways.  It is for similar reasons that companies do not – and should not – publicize the number of opt-outs that would trigger a "blow" provision in a class settlement

1  context; if all participants were told that number, some could undermine or threaten to undermine the

2  deal for reasons benefiting only themselves.  Overdisclosure in this situation would pose a risk of

3  manipulation, and the same is true here.  As a matter of law, Defendants in this case had no

4  obligation to publicize the details of the margin call trigger provisions; as a practical matter, the

5  exhaustive disclosures Plaintiffs say they were entitled to would have risked harm to both SunEdison

6  and its investors.

7          Beyond this, moreover, a SunEdison investor or potential investor who for some reason was

8  truly interested in obtaining additional information about the Margin Loan triggers was not without

9  resources.  In the same Form 10-Q in which it described the terms of the Margin Loan, SunEdison

10 also disclosed that during Q1 2015, it had entered into an amendment of a February 2014 credit

11 facility agreement.  Ex. B at 23-24.  SunEdison explained that one consequence of the credit facility

12 amendment was that its subsidiary would be able to enter into the Margin Loan Agreement and to

13 post TERP stock as collateral for that loan.  *Id.*  The full text of the credit facility amendment was

14 included in an earlier Form 10-K.  Ex. E at Exhibit 10.130.  That text shows, among other things, the

15 number of TERP shares used to secure the $410 million Margin Loan:  "Margin Loan Pledged

16 Equity means (i) up to 32,200,000 class B units of common stock, par value $0.01 per share, of

17 TerraForm Power, Inc. . . ."  *Id.* at page 4 of Exhibit 10.130.  Multiplying that figure by the trading

18 price of TERP stock provides an approximation of the value of the collateral on any given day.

19 Combined with the publicly disclosed requirement of a 2:1 value to loan ratio, investors could

20 calculate roughly when a margin call would be triggered.[3]

21          Indeed, it is the 32.2 million figure that Plaintiffs have used to derive their hypothesis that a

22 triggering event occurred on August 7, 2015.  Com. ¶ 76 n.2.  Plaintiffs have simply multiplied the

23 $25.24 closing price of TERP Class A stock on August 7, 2015 by 32.2 million; this yields a value of

24 $812,928,000, or just under the $820 million value required to maintain the 2:1 value to loan ratio.

25 *Id.*  Plaintiffs do not contend that some "truth" beyond the publicly available 32.2 million share

---

[3] This figure would be only an approximation because the 32.2 million shares of TERP stock were not the only collateral for the loan; the loan was also secured by certain other rights in the securities of a related party, Terra LLC.  Com. ¶¶ 76 n.2, 127.

1   figure was revealed to them between the time they made their investment and the time they filed this

2   lawsuit.  Nor do they say that the revelation of any such "truth" enabled them to determine that (in

3   their view) a margin call was made on August 7, 2015.  The facts on which Plaintiffs now base their

4   claim that SunEdison "breached" the margin provisions in August 2015 – and therefore that

5   SunEdison omitted material facts from the Prospectus – have been a matter of public record all

6   along.

7        ***The facts relating to SunEdison's liquidity were disclosed.***  Plaintiffs next say that

8   statements SunEdison made about its operations and plans for growth were misleading because the

9   Company withheld the facts that signaled to investors that it was facing a "liquidity shortfall."  Com.

10  ¶¶ 133, 135(a).  But SunEdison did disclose the relevant facts.  The facts relevant to a company's

11  liquidity are revealed in its financial statements, and in particular in its cash flow statements.  *See*

12  Ex. C at 7; Ex. E at 47 & pages 40-41 of Exhibit 13.  Plaintiffs do not seriously challenge the

13  accuracy of SunEdison's financial statements here.[4]  Nor can they dispute that SunEdison repeatedly

14  cautioned the market that it faced risks in maintaining its liquidity, and that going forward, the

15  Company needed to raise additional funds to meet its operating and capital needs.  Ex. C at 61; *see*

16  *also* pages 14 and 18-19 below (citing further cautionary statements related to liquidity).

17        Instead, what Plaintiffs appear to say was missing was the conclusion that SunEdison's

18  liquidity was insufficient for its purposes.  But where a company properly discloses its financial

19  position in its financial statements – as SunEdison did here – the company is not required to go

20

21  [4] The sole possible allegation directed at the company's financial statements is Plaintiffs' statement
    that SunEdison "falsely classified" the Margin Loan as non-recourse debt. Com. ¶ 55. We note that
22  Plaintiffs make this allegation only in the background section of their complaint; they do not include
    the non-recourse classification in the list of statements on which their claims are based. *Id.* ¶¶ 124-
23  35. And the allegation does not hold up in any event. Plaintiffs say the debt cannot have been non-
    recourse in Q1 and Q2 2015 because SunEdison classified the same debt as recourse in Q3 2015. *Id.*
24  But this scarcely creates an inference of falsity. SunEdison explained in its Form 10-Q for Q3 2015
    that the Margin Loan Agreement was *amended* in September 2015. Ex. D at 28. Plaintiffs allege no
25  facts suggesting that the change from a non-recourse to a recourse classification was an "admission"
    of falsity rather than the effect of the amendment. This is fatal. *In re Glenfed, Inc., Sec. Litig.*, 42
26  F.3d 1541, 1548 (9th Cir. 1994) (en banc) (in securities cases, "often there is no reason to assume
    that what is true at the moment plaintiff discovers it was also true at the moment of the alleged
27  misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the
    current state of facts, the charged statement must have been false").

28

9

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-cv-02263-WHA

beyond this and to make the kind of characterization Plaintiffs suggest was lacking. *See In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102, 126 (D. Mass. 2003) (rejecting claim that defendants breached a duty to disclose liquidity problems where plaintiffs were unable to establish inaccuracies in the company's financial statements; "the securities laws do not impose on reporting companies an obligation to characterize their results – even if their results are very poor – in pejorative fashion"), *vacated in part on other grounds*, 414 F.3d 187 (1st Cir. 2005); *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 629 (M.D.N.C. 1998) ("When issuers accurately and completely disclose their operating expenses and net losses and accurately and completely list all of the factors for these losses, pejorative descriptions of those factors are not required") (collecting authorities).  The relevant facts relating to liquidity, like the relevant facts relating to the Margin Loan, were in the public domain.

Plaintiffs, indeed, at one point appear to acknowledge that the facts relating to SunEdison's liquidity were circulating in the marketplace – and moreover that the market responded to that information negatively.  Plaintiffs say that when SunEdison announced on July 20, 2015 that it had agreed to acquire Vivint Solar for $2.2 billion, the market reacted unfavorably, reflecting concern that SunEdison would be unable to afford the acquisition and at the same time fund the purchase, development and construction of projects it intended to drop down to its yieldcos.  Com. ¶ 62. According to Plaintiffs, "[t]hese and other concerns over the [Vivint] deal caused the price of both SUNE and TERP shares to decline significantly following the announcement of the [Vivint] acquisition."  *Id.*  Investors, in other words, knew what SunEdison's financial position was and also knew about the very significant additional debt burden the Company planned to take on in connection with the Vivint acquisition.  The market incorporated that information and SunEdison's stock price fell.  Rather than supporting an inference that information was concealed, this shows the market reaching its own informed conclusions about what was revealed by the Company's truthful disclosures.

10

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

## 2.   Defendants Had No Ability To Disclose The Allegedly Missing Facts In The Q2 2015 Form 10-Q Incorporated By Reference Into The Prospectus.

The Prospectus, as previously noted, incorporated by reference SunEdison's Form 10-Q for Q2 2015.  The Form 10-Q covered the quarter ended June 30, 2015; it was filed August 6, 2015. Several of the statements Plaintiffs challenge appear in the incorporated 10-Q rather than in the body of the Prospectus itself.  Com. ¶¶ 124, 127, 133-34.  Plaintiffs allege that the statements in the 10-Q were false and misleading because SunEdison failed to disclose the events of August 7, 2015 (when they say a margin call was made under the Margin Loan Agreement) and August 11, 2015 (when SunEdison entered into the August 2015 Loan agreement).  This claim fails for a simple chronological reason:  SunEdison could not disclose on August 6, 2015 events that did not occur until August 7, 2015 and August 11, 2015.

In an effort to surmount this problem, Plaintiffs allege that the purported August 7, 2015 margin call was "imminent" in late July 2015, and that the August 11, 2015 loan was "structured" in July 2015.  Com. ¶¶ 65, 69.  This does not fix the problem.  Securities issuers are not required to foretell the future, and perhaps no future event is more difficult to predict than the performance of a stock.  *See*, *e.g.*, *Bulmahn*, 53 F. Supp. 3d at 897 (defendants cannot be faulted for failing to foresee or disclose the prospect of company's bankruptcy, particularly as such a prediction "would most assuredly operate as a self-fulfilling prophecy").  TERP stock closed at $30.16 on July 31, 2015; according to Plaintiffs, the margin call was triggered when it fell to $25.24.  Ex. F.  A public prediction on July 31, 2015 that TERP's stock would fall by 15% in the near term would have been nothing short of reckless; in any event, it certainly was not mandated by the securities laws.  As to the August 2015 Loan, complex financing transactions such as the loan agreement are not constructed overnight.  A potential transaction that is still in its formative stages is not a transaction that an issuer can or should disclose.  Plaintiffs' allegations of "imminence" and "structuring" cannot reverse the flow of time.

1

2

### 3.   Plaintiffs Plead No Facts Showing That The Challenged Statements Made Elsewhere In The Prospectus Were Materially False Or Misleading By Way Of Omission.

3

The analysis is different for the challenged statements in the Prospectus itself, which

4 SunEdison filed on August 18, 2015 – after the purported events of August 7 and August 11, 2015.

5 The outcome, however, is the same.  As discussed above, issuers (together with their officers,

6 directors and underwriters) have no duty under the Securities Act to provide investors with *all*

7 information, nor even with *all material* information.  *See* pages 5-6 above (citing authorities).  The

8 extensive regulations governing the content of registration statements and statutory prospectuses –

9 largely contained in Regulation S-K – ensure that investors are provided with a wealth of

10 information when a company issues a new offering of securities.  As a result, as long as issuers

11 comply with those regulations, plaintiffs may recover investment losses only if they can identify an

12 affirmative statement in the offering materials rendered misleading by virtue of omitted information.

13 *Omnicare*, 135 S. Ct. at 1322 (no "general disclosure requirement" under the Securities Act).

14

Plaintiffs contend that three portions of the Prospectus itself (as opposed to the Form 10-Q

15 incorporated by reference) fit that description:  (1) the "Use of Proceeds" discussion; (2) the

16 description of agreements between SunEdison and certain of its underwriters with respect to

17 transactions other than the offering; and (3) the discussion of "Recent Developments."  Com. ¶¶ 129,

18 132, 136.  The facts pled in the complaint, however, do not show that any of these statements was

19 misleading.  If anything, they show the opposite.

20

With respect to the "Use of Proceeds," SunEdison stated the following:

21

> We expect to use the net proceeds of this offering for general corporate purposes, which we
22 > expect to include funding working capital and growth initiatives.  At this time, we have not
> specifically identified a large single use for which we intend to use the net proceeds, and
23 > accordingly, we are not able to allocate the net proceeds among any potential uses in light of
> the variety of factors that will impact how which net proceeds will ultimately be utilized by
> us.

24

*Id.* ¶ 136.  Plaintiffs complain that SunEdison failed to disclose that the "true purpose" of the

25 offering was to address a "current liquidity shortfall."  *Id*. ¶ 137.  Even if this were true, it would

26 not show that the statement was false or misleading.  Addressing liquidity issues falls well within

27 the broadly worded "general corporate purposes."  The reference to "funding working capital,"

28

12

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-cv-02263-WHA

moreover, further put investors on notice that proceeds of the offering were to be used, among other things, to satisfy the Company's cash flow needs.  More specific information about liquidity, of course, was set forth in SunEdison's financial statements, and it was to those – rather than to the abbreviated "Use of Proceeds" section – that experienced investors would look for details about the Company's financial position.

Much the same applies to SunEdison's discussion of its relationships with certain of the underwriters in the offering:  Here too, SunEdison's public statements included the relevant information.  SunEdison explained in those public disclosures that certain of the underwriters had provided and could in the future continue to provide a variety of services to the Company; SunEdison also specifically identified the $410 million Margin Loan, a commitment letter for a $500 million secured term loan from Goldman Sachs, and a variety of other arrangements between SunEdison or its subsidiaries and various of the underwriters involving loans of up to nearly $1 billion.  *Id.* ¶ 129; Ex. A at S-68.  SunEdison further disclosed that affiliates of some of the underwriters were (or would soon be) equity investors in SunEdison and its projects.  *Id.*  Investors reading these disclosures would be well aware of the numerous financial ties between the issuer and certain of the underwriters.  Armed with that information, they could reach reasoned conclusions about the underwriters' range of financial interests and incentives.  The fact that SunEdison had recently entered into an additional loan agreement involving less than $200 million would not materially alter that analysis.  Nor does the absence of that information make the detailed disclosure of SunEdison's *other* and collectively more substantial relationships with the underwriters misleading by way of omission:  Again, there is no general duty of completeness under the Sections 11 and 12(a)(2).  *Rubke*, 551 F.3d at 1162-63.

This is true as well of the final challenged statement in the Prospectus – SunEdison's list of recent developments, which Plaintiffs say was false or misleading because it did not include the August 2015 Loan or the alleged margin call on the Margin Loan.  Com. ¶ 132.  Again, even assuming these events were material, this does not mean that the issuer was required to disclose them.  *Omnicare*, 135 S.Ct. at 1322.  Nor does their absence from a list mean that the list in its

1   entirely became an actionable misstatement because it was incomplete.  An issuer's duty under the

2   Securities Act is to avoid misleading statements, not incomplete statements.

3         Finally, even if the law were otherwise – even if issuers were saddled with the unworkable

4   duty to disclose all material information – Plaintiffs' omission claim would fail because the allegedly

5   undisclosed information falls short on materiality grounds.  Investors were well aware at the time of

6   the Preferred Stock Offering of the rate at which SunEdison was taking on debt:  The Company

7   disclosed in the Form 10-Q for Q2 2015 that its debt as of June 30, 2015 totaled more than

8   $10.7 billion, up from less than $7 billion only six months before.  Ex. C at 18.  The Company

9   further disclosed that, in order to "maintain sufficient liquidity," it would likely need to incur still

10  more debt in the future to "meet the operating and capital needs of [its] renewable energy system

11  development business."  *Id.* at 61.  And investors were told, in the "Recent Developments" section of

12  the Preferred Stock Offering prospectus, that in the time since the end of Q2 2015, (1) SunEdison

13  had entered into commitment letters with certain funds and with a syndicate of banks to create a

14  $1 billion warehouse lending agreement, including $700 million of debt funding, and

15  (2) SunEdison's yieldco, Global, had completed the sale of $810 million in notes.  Ex. A at S-2

16  through S-3.  In the context of this very substantial disclosed actual and anticipated indebtedness, the

17  incremental $169 million August 2015 loan does not reach the materiality threshold; it constitutes no

18  more than 1.5% of SunEdison's total debt. [5]  In short, Plaintiffs' claims fail not only because

19  Plaintiffs can identify no duty to provide the allegedly omitted information, but also because that

20  information, properly considered in context, was not material.

21  [5] Plaintiffs claim that the August 2015 Loan was nevertheless significant because of what its
22  disclosure would have signaled to investors about SunEdison's overall financial condition.  Plaintiffs
    say that the "effective" interest rate of the loan was 15% (9.25% interest plus a $9 million
23  origination fee), which they calculate to be "more than 14 percentage points over the then-prevailing
    LIBOR one-year rate of 0.8467%."  Com. ¶ 67 (emphasis deleted).  Plaintiffs go on to say that the
24  disclosure of terms this onerous would have been "a tacit admission, or at a minimum a red flag, that
    the representations about SUNE's financial strength, liquidity and capital resources . . . were false."
25  *Id.* ¶ 70.  But Plaintiffs are wrong; they are comparing apples to oranges.  Lenders do not use LIBOR
    rates for loans to their borrowers; the LIBOR rate is only a base, over which lenders charge a spread
26  that varies with the nature of the loan.  The spread over LIBOR for second-lien loans in Q3 2015
    was 866.07 basis points.  Ex. G.  Added to the LIBOR rate of 0.8467%, this amounts to an interest
27  rate of over 9.5%  –  higher than the 9.25% SunEdison agreed to pay.  As for the $9 million
    origination fee, Plaintiffs plead no facts suggesting that this was anything other than customary in
28  the market for a transaction of this sort.

1

          **4.**       **Plaintiffs Have Not Pled A Violation Of Regulation S-K.**

2          Finally, in addition to claiming that the affirmative statements in the Prospectus were

3 rendered misleading by virtue of the purportedly omitted information, Plaintiffs make a half-hearted

4 attempt to suggest that SunEdison had a duty to disclose that information independent of any

5 affirmative statement in the offering materials.  Plaintiffs say that the Prospectus improperly "failed

6 to disclose . . . material trends in SUNE's liquidity and capital resources."  Com. ¶ 131.  This

7 appears to be a reference to Item 303 of Regulation S-K, which requires the disclosure of "known

8 trends" that are likely to have a material impact on various of an issuer's financial metrics.

9 17 C.F.R. § 229.303.

10          It is easy to see why Plaintiffs have not seen fit to pursue this theory of liability with anything

11 more than a glancing reference (and without so much as a citation to the authority they apparently

12 aim to invoke).  A "trend" necessarily consists of more than a single event or transaction, occurring

13 within a single quarter.  *E.g.*, *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617,

14 at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period of time does not establish

15 a 'trend' for purposes of the disclosures required by Item 303") (citing authorities).

16          In addition, because Item 303 requires only the disclosure of "known" trends, a Securities

17 Act claim based on this rule – as opposed to Section 11 claims generally – includes the element of

18 scienter.  *E.g.*, *Blackmoss*, 2010 WL 148617, at *9-10 (Item 303 "requires that a plaintiff plead, with

19 some specificity, facts establishing that the defendants had actual knowledge of the purported

20 trend"); *J&R Mrktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008) ("While Section

21 11 does not require any additional knowledge, that does not change the fact that the duty of

22 disclosure arising from Item 303 does require knowledge").  But in this case, Plaintiffs have

23 specifically *disavowed* that element.  Com. ¶¶ 111, 140 ("Plaintiffs do not allege that defendants

24 acted with scienter").  A plaintiff who makes such a disavowal is foreclosed from asserting claims in

25 which scienter is an element.  *See Omnicare*, 135 S.Ct. at 1327 (where plaintiffs disavow fraud, they

26 may not pursue the theory that defendants' opinion statements were subjectively false); *In re Velti*

27 *PLC Sec. Litig.*, 2015 WL 5736589, at *18 (N.D. Cal. Oct. 1, 2015) (same).

28

**B.      The Majority Of The Allegedly False Or Misleading Statements Are Inactionable As A Matter Of Law.**

In addition to the defects discussed above, which undermine Plaintiffs' case as a whole, various aspects of Plaintiffs' claims fail on narrower grounds.  Numerous statements are inactionable as a matter of law for the simple reason that they were not contained in the offering documents. Those statements that are part of the offering documents cannot support a Securities Act claim for other reasons.

**1.      Statements Outside The Four Corners Of The Offering Documents.**

Plaintiffs' claims fail with respect to numerous allegedly false or misleading statements outside the four corners of the offering documents.  The text of Sections 11 and 12(a)(2) makes plain that liability is limited to representations made within a registration statement or prospectus. 15 U.S.C. § 77k (imposing liability "[i]n case any part of *the registration statement*, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading") (emphasis added); 15 U.S.C. § 77*l*(a)(2) (imposing liability when securities are sold "by means of a *prospectus* or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading") (emphasis added).  The case law is in accord.  *E.g.*, *In re Molycorp, Inc. Sec. Litig.*,  – F. Supp. 3d – , 2016 WL 233402, at *19 (D. Colo. Jan. 29, 2016) ("A Section 11 plaintiff must identify a material misrepresentation within the four corners of the challenged registration statement, or an omission of a material fact required to be stated therein, or necessary to make the statements therein not misleading") (internal quotation marks and citation omitted); *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1247 (D.N.M. 2010) (same); *In re Metricom Sec. Litig.*, 2004 WL 966291, at *9 (N.D. Cal. Apr. 29, 2004) ("Sections 11(a) and 12(a)(2) apply only to material misrepresentations or omissions within the four corners of a registration statement or prospectus") (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571 (1995)).[6]

---

[6] Section 12(a)(2) applies to certain oral statements as well as to statements in a written prospectus. The law is clear, however, that oral statements are actionable only insofar as they relate to the written prospectus itself.  *Gustafson*, 513 U.S. at 567-68; *In re Refco, Inc. Sec. Litig.*, 503 F. Supp.

16

Notwithstanding this law, Plaintiffs contend (or in some cases, imply) that the following statements were false or misleading:

- Statements made during a July 27, 2015 TERP conference call with investors and analysts (Com. ¶ 64);

- Statements made during an August 6, 2015 joint SunEdison and TERP Q2 earnings call (*id.* ¶¶ 72-75);

- Statements made in SunEdison press releases issued August 12, 2015 (*id.* ¶ 79);

- Statements made on August 31, 2015 by analysts covering SunEdison (*id.* ¶ 85);

- Statements made in two SunEdison press releases issued September 8, 2016 (*id.* ¶¶ 86-87); and

- Statements made during an October 7, 2015 SunEdison conference call with investors and analysts (*id.* ¶¶ 94-95).

Because none of these statements was contained within the offering documents, the Court should dismiss Plaintiffs' claims as a matter of law insofar as they are based on these or any other statements that are not part of the offering documents.[7]

### 2.    Statements Within The Offering Documents.

The challenged statements actually contained within the Prospectus are relatively few in number.  They are confined to:

- The statements contained in the Use of Proceeds, Recent Developments and Underwriting portions of the Prospectus (Com. ¶¶ 129, 132, 136);

- The description of the Margin Loan in the Q2 2015 Form 10-Q incorporated into the Prospectus (*id.* ¶ 127);

- The discussion of liquidity in the same Form 10-Q (*id.* ¶ 124); and

- The overview of SunEdison's business in the same Form 10-Q (*id.* ¶ 134).

We have discussed the statements in the first bullet point in detail above, and do not further belabor them here.  *See* pages 12-14 above.  The description of the Margin Loan, also as previously

---

2d 611, 625 (S.D.N.Y. 2007).  Plaintiffs do not challenge or even cite any such oral statements here; the oral statements they cite do not relate the Preferred Stock Offering, much less to the Prospectus. Com. ¶¶ 64, 72-74.

[7] Plaintiffs may at least implicitly recognize that none of these statements is actionable.  While Plaintiffs appear to challenge the statements in the body of their complaint, Plaintiffs do not include them under the headings of their particular claims.  *See* Com. ¶¶ 109-148.

17

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-cv-02263-WHA

1    discussed, is the disclosure that undermines Plaintiffs' omission claim.  It is not a statement that

2    Plaintiffs have shown to be false or misleading in any way.

3            This leaves the final two statements – the discussion of liquidity and the overview of

4    SunEdison's business.  Neither is actionable.  SunEdison stated the following about liquidity:

5        We believe our liquidity will be sufficient to support our operations for the next
         twelve months, although no assurances can be made if significant adverse events
6        occur, or if we are unable to access project capital needed to execute our business
         plan.
7
         In addition to our need to maintain sufficient liquidity from cash flow from our
8        operations and borrowing capacity under our credit facilities, we will need to raise
         additional funds in the future in order to meet the operating and capital needs of
9        our renewable energy system development business . . . . However, there can be
         no assurances that such project financing or equity will be available to us, or
10       available on at terms and conditions we find acceptable.  We may not be able to
         sell renewable energy projects or secure adequate debt financing for such projects
11       on favorable terms, or at all, at the time when we need such funding.

12       In the event that we are unable to raise additional funds, our liquidity will be
         adversely impacted, we may not be able to maintain compliance with our existing
13       debt covenants and our business will suffer.  If we are able to secure additional
         financing, these funds could be costly to secure and maintain and could
14       significantly impact our earnings and liquidity.

15   Com. ¶ 124.

16          This discussion, among other things, consists almost entirely of forward-looking statements –

17   "we believe our liquidity *will* be sufficient," "we *will* need to raise additional funds," "we *may not be*

18   *able to* sell renewable energy products."  Such statements are protected by the bespeaks caution

19   doctrine, which "provides a mechanism by which a court can rule as a matter of law that defendants'

20   forward-looking representations contained enough cautionary language or risk disclosure to protect

21   the defendant against claims of securities fraud."  *In re Stac Elec. Sec. Litig*., 89 F.3d 1399, 1408

22   (9th Cir. 1996) (internal quotation marks and citation omitted).[8]

23          SunEdison provided ample cautionary language and risk disclosures related to liquidity.  In

24   the very text Plaintiffs cite, the Company cautioned investors that "no assurances can be made if

25

26   _____

27   [8] *See also*, *e.g.*, *Worlds of Wonder*, 35 F.3d at 1415 (adopting bespeaks caution doctrine for
     Securities Act claims); *In re Violin Memory Sec. Litig*., 2014 WL 5525946, at *13 (N.D. Cal.
     Oct. 31, 2014) (dismissing in part Securities Act claims under bespeaks caution doctrine).

28

significant adverse events occur, or if we are unable to access project capital needed to execute our business plan."  Com. ¶ 124.  SunEdison went on to warn that it could be "costly" to raise the funds necessary to meet its liquidity needs, and that this in turn could further impact both liquidity and earnings.  *Id.*  Meanwhile, in the Form 10-K also incorporated by reference into the Prospectus, SunEdison told investors that the Company "may not be able to generate sufficient cash to service all of [its] indebtedness and may be forced to take other actions to satisfy [its] obligations under [its] indebtedness, which may not be successful."  Ex. E at 33.  The Company went on to warn that this in turn could result in "substantial liquidity problems" that could force the Company to delay investments – or even to file for bankruptcy.  *Id.*  The bespeaks caution doctrine applies squarely to situations like this, where a company that makes predictions in areas requiring the exercise of judgment also takes pains to spell out for investors the risks and uncertainties that may cause actual results to differ from its projections.

SunEdison's challenged prediction about its liquidity is inactionable for another reason as well.  It is a statement of opinion – "we believe our liquidity will be sufficient" – and therefore is governed by the Supreme Court's recent *Omnicare* decision.  Under *Omnicare*, plaintiffs asserting Securities Act claims under an omission theory – which is what Plaintiffs are doing here – must

> identify particular (and material) facts going to the basis for the issuer's opinions – facts about *the inquiry* the issuer did or did not conduct or *the knowledge* it did or did not have – whose omission makes the opinion statements at issue misleading to a reasonable person reading the statement fairly and in context.

135 S. Ct. at 1332 (emphasis added). Plaintiffs have pled no such facts here, and their challenge therefore fails under *Omnicare*.[9]

Finally, Plaintiffs challenge the following statement:

> During the second quarter of 2015, we continued execution of a strategic plan for the ongoing operation of our businesses.  Our business strategy is designed to address the most significant opportunities and risks [that] we currently face.

---

[9] Plaintiffs may also proceed under a falsity theory under *Omnicare* – as opposed to an omission theory – in which case they must allege that defendants did not subjectively hold the opinions they espouse.  *Id.* at 1336.  Plaintiffs do not allege that here.  Nor could they.  As noted above, Plaintiffs disavow any allegation of scienter.  Com. ¶¶ 111, 140.  Parties who make such disavowals "effectively plead[ ] themselves out of stating a claim under Section 11's false-statements clause."  *Velti*, 2015 WL 5736589, at *18 (citing *Omnicare* and dismissing claim on this basis).

19

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-cv-02263-WHA

Com. ¶ 134.  Following this statement, SunEdison identified three such opportunities and risks, each related to the growth of its business or to "[m]anaging working capital in consideration of our growth initiatives." *Id.*

This statement too is inactionable for multiple reasons.  The identification of opportunities and risks is both forward-looking and based on opinion.  Meanwhile, the references to the Company's "strategic plan" and to the objects of its "business strategy" fall within the category of "mildly optimistic, subjective assessment[s]" that the Ninth Circuit has deemed inactionable.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  As the *Cutera* court explained, "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."  *Id.*  Rather "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."  *Id.* (internal quotation marks and citations omitted).  Plaintiffs here, who are professional investors, are the last parties who should be pursuing claims based on their post hoc disagreement with general or aspirational terms.

### C.    Plaintiffs' Section 12(a)(2) Claim Against The Individual Defendants Fails As A Matter Of Law.

Plaintiffs seek to assert Section 12(a)(2) claims against the Individual Defendants on the basis of purchases they say are "traceable to the SUNE Preferred Stock Offering Materials."  Com. ¶ 112.  Plaintiffs do not allege that they purchased securities from SunEdison or from any of the Individual Defendants.  Nor could they.  The Preferred Stock Offering was a firm commitment offering, in which securities were sold solely by the members of the underwriting syndicate.  Ex. A at S-65.

The Individual Defendants are consequently not liable to Plaintiffs under Section 12(a)(2).  Pursuant to that statute, a defendant is liable *only* "to the person purchasing [a] security from him." 15 U.S.C. § 77*l*(a)(2).  Under controlling law, liability is therefore limited to two narrow classes of defendants:  (1) those who sold securities directly to the plaintiff; and (2) those who solicited securities from the plaintiff.  *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *see also*, *e.g.*, *In re Daou Sys.*

20

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. 3:16-CV-02263-WHA

*Sec. Litig.*, 411 F.3d 1006, 1029 (9th Cir. 2005) (citing *Pinter*). The Individual Defendants clearly do not fall within the first category, and Plaintiffs do not allege otherwise. *See* Com. ¶¶ 8, 112.

The Individual Defendants do not come within the second category either. Plaintiffs contend that both SunEdison and all of the officer and director defendants are liable as "solicitors" because they participated in drafting offering documents and took part in road shows intended to promote those offerings. Com. ¶¶ 10, 25. But it is precisely these kinds of routine activities that courts have repeatedly held do *not* constitute solicitation under the second prong of *Pinter*. "Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show" – but it is plain that "virtually all issuers" are not for that reason liable as solicitors under Section 12(a)(2). *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *7 (W.D. Wash. Dec. 29, 2008) (internal quotation marks and citations omitted); *see also, e.g.*, *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *9-10 (C.D. Cal. May 5, 2011) (neither preparing the prospectus nor participating in road shows constitutes solicitation under Section 12(a)(2)).

An issuer (together with its officers and directors) thus does not become a Section 12(a)(2) solicitor simply by performing the routine activities alleged here. Instead, an issuer qualifies as a statutory solicitor only when it assumes the "unusual" role of becoming the *agent* of the entity selling securities. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003). One does not become an agent by drafting offering documents or participating in road shows. Only if an issuer is in *direct* contact with the purchasers of its securities may that company (or its officers and directors) be considered as the seller's agent – and thus as a party within the scope of Section 12(a)(2). *Id.* at 871 ("To count as 'solicitation,' the seller must, at a minimum, *directly* communicate with the buyer") (emphasis added); *Violin Memory*, 2014 WL 5525946, at *18 (same); *Thornburg*, 695 F. Supp. 2d at 1219-21 (same; collecting authorities). As a result, courts routinely dismiss claims against issuers (and their officers and directors) who engage in precisely the same routine offering activities Plaintiffs allege here. *Countrywide*, 2011 WL 4389689, at *10 (dismissing claims); *Thornburg*, 695 F. Supp. 2d at 1221 (dismissing claims); *Fouad*, 2008 WL 5412397, at *7 (dismissing claims). This Court should dismiss plaintiffs' Section 12(a)(2) claims against the Individual Defendants for the same reason.

IV.    **CONCLUSION**

For the reasons stated above, the Court should dismiss Plaintiffs' claims in their entirety.

Dated:  May 20, 2016                              Respectfully submitted,


                                    By:    /s/ Sara B. Brody
                                           Sara B. Brody, SBN 130222

                                           SIDLEY AUSTIN LLP
                                           555 California Street, Suite 2000
                                           San Francisco, California  94104
                                           Telephone:  (415) 772-1200
                                           Facsimile:  (415) 772-7400
                                           sbrody@sidley.com

                                           *Attorneys for SunEdison, Inc., Ahmad
                                           Chatila, Brian Wuebbels, Martin Truong,
                                           Emmanuel Hernandez, Antonio R. Alvarez,
                                           Clayton Daley, Jr., Georganne Proctor,
                                           Steven Tesoriere, James B. Williams, and
                                           Randy H. Zwirn*


                                    By:    /s/ Brett Hammon
                                           Brett Hammon, SBN 288325

                                           WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                           950 Page Mill Road
                                           Palo Alto, California 94304
                                           Telephone: (650) 858-6000
                                           Facsimile (650) 858-6100
                                           Brett.Hammon@wilmerhale.com

                                           Michael Bongiorno (admitted *pro hac vice*)
                                           Timothy Perla (admitted *pro hac vice*)
                                           WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                           60 State Street
                                           Boston, Massachusetts 02109
                                           Telephone: (617) 526-6000
                                           Facsimile (617) 526-5000
                                           Michael.Bongiorno@wilmerhale.com
                                           Timothy.Perla@wilmerhale.com

                                           *Attorneys for Peter Blackmore*

22

1

## SIGNATURE ATTESTATION

2

I am the ECF User whose identification and password are being used to file the foregoing

3

document.  In compliance with Civil L.R. 5-1, I hereby attest that the signatory has concurred in this

4

filing.

5

6

Dated:  May 20, 2016                              Respectfully Submitted,

7

8

By:   /s/ Sara B. Brody
      Sara B. Brody, SBN 130222

9

      SIDLEY AUSTIN LLP

10

      555 California Street, Suite 2000
      San Francisco, California  94104
      Telephone:  (415) 772-1200

11

      Facsimile:  (415) 772-7400
      sbrody@sidley.com

12

13

      *Attorneys for SunEdison, Inc., Ahmad*
      *Chatila, Brian Wuebbels, Martin*

14

      *Truong, Emmanuel Hernandez, Antonio*
      *R. Alvarez, Clayton Daley, Jr.,*

15

      *Georganne Proctor, Steven Tesoriere,*
      *James B. Williams, and Randy H. Zwirn*

16

17

18

19

20

21

22

23

24

25

26

27

28