ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (168593)
JAMES I. JACONETTE (179565)
SCOTT H. SAHAM (188355)
JENNIFER N. CARINGAL (286197)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
jamesj@rgrdlaw.com
scotts@rgrdlaw.com
jcaringal@rgrdlaw.com
      – and –
DENNIS J. HERMAN (220163)
DAVID W. HALL (274921)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
dhall@rgrdlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COBALT PARTNERS, LP, et al., | Case No. 3:16-cv-02263-WHA |
| Plaintiffs, | PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND JOINDERS THEREIN |
| vs. | |
| SUNEDISON, INC., et al., | DATE: August 18, 2016 |
| Defendants. | TIME: 8:00 a.m. |
| | COURTROOM: Courtroom 8, 19th Floor |
| | JUDGE: Hon. William Alsup |

1158379_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................................1

II.   ARGUMENT ....................................................................................................3

    A.    The Omitted Information Was Not Disclosed ........................................3

        1.    Neither the Margin Loan Breach nor the 15% Goldman Loan Used to Cure It Was Disclosed Prior to the Offering............................4

        2.    SUNE's Financial Statements Did Not Disclose the Margin Loan Breach, 15% Goldman Loan, or the Weakened Liquidity Reflected by Those Events .....................................................................6

        3.    Warning of Risks that Might Arise a Year or More into the Future Does Not Alert Investors that the Warned-of Events Have Already Occurred ..........................................................................8

    B.    Cobalt Was Misled by Defendants' Failure to Disclose the Margin Loan Breach and the 15% Goldman Loan, and the Deteriorating Liquidity Revealed by Those Events ......................................................10

        1.    SEC Regulations Required SUNE to Disclose the Margin Loan Breach, 15% Goldman Loan and Weakened Liquidity in the Prospectus ..................................................................................10

        2.    The Omissions Rendered the Offering Documents Misleading ...............15

            a.    Defendants Had a Duty to Update the Misleading Information in SUNE's 2Q15 10-Q Report that Was Incorporated into the Prospectus ......................................16

            b.    Defendants' Contention that the Omissions Were Immaterial Is Incorrect and Contradicts the Pleadings .................19

    C.    All of the Alleged Misrepresentations and Omissions Are Actionable ................23

    D.    Defendants Are Statutory Sellers Under Section 12.............................26

        1.    The Moving Defendants Are All Statutory Sellers....................................27

        2.    The Underwriter Defendants Are Also Liable Under §12(a)(2)...............29

    E.    Defendants Provide No Reason to Dismiss Claims Under Section 15 .................29

III.  CONCLUSION................................................................................................30

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................3

5

6

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,*
  2010 WL 148617
  (S.D.N.Y. Jan. 14, 2010)................................................................12, 14

7

8

*Briarwood Invs. Inc. v. Care Inv. Tr. Inc.,*
  2009 WL 536517
  (S.D.N.Y. Mar. 4, 2009) ................................................................27

9

10

*Capri v. Murphy,*
  856 F.2d 473 (2d Cir. 1988)................................................................26

11

12

*Currie v. Cayman Res. Corp.,*
  835 F.2d 780 (11th Cir. 1988) ................................................................29

13

*Degulis v. LXR Biotechnology,*
  928 F. Supp. 1301 (S.D.N.Y. 1996)................................................................27

14

15

*Demarco v. Edens,*
  390 F.2d 836 (2d Cir. 1968)................................................................29

16

17

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc.,*
  987 F. Supp. 2d 369 (S.D.N.Y. 2013)................................................................17

18

*Feyko v. Yuhe Int'l, Inc.,*
  2013 U.S. Dist. LEXIS 29905
  (C.D. Cal. Mar. 5, 2013) ................................................................20

19

20

*Firefighters Pension & Relief Fund v. Bulmahn,*
  53 F. Supp. 3d 882, 897 (E.D. La. 2014) ................................................................19

21

22

*Gallagher v. Abbott Lab.,*
  269 F.3d 806 (7th Cir. 2001) ................................................................18, 19

23

24

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)................................................................10

25

26

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983)................................................................3

27

*In re Alliance Pharm. Corp. Sec. Litig.,*
  279 F. Supp. 2d 171 (S.D.N.Y. 2003)................................................................17

28

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                                    - ii -

1

2                                                                                        **Page**

3

*In re Am. Bank Note Holographics Sec. Litig.*,
4       93 F. Supp. 2d 424 (S.D.N.Y. 2000)...................................................................29

5  *In re Am. Int'l Grp., Inc.*,
        741 F. Supp. 2d 511 (S.D.N.Y. 2010).................................................................15
6

7  *In re Am. Realty Capital Props., Inc. Litig.*,
        2015 U.S. Dist. LEXIS 151966
8       (S.D.N.Y. Nov. 6, 2015) ......................................................................................27

9  *In re APAC Teleservices, Inc. Sec. Litig.*,
        1999 WL 1052004
10      (S.D.N.Y. Nov. 19, 1999) ....................................................................................27

11 *In re Bare Escentuals, Inc. Sec. Litig.*,
        745 F. Supp. 2d 1052 (N.D. Cal. 2010) ..............................................................28
12

13 *In re Charles Schwab Corp. Sec. Litig.*,
        257 F.R.D. 534 (N.D. Cal. 2009).........................................................................26
14

15 *In re Children's Place Sec. Litig.*,
        1998 U.S. Dist. LEXIS 22868
16      (D.N.J. Sept. 4, 1998) ..........................................................................................11

17 *In re Cutera Sec. Litig.*,
        610 F.3d 1103 (9th Cir. 2010) .............................................................................25
18

19 *In re Daou Sys.*,
        411 F.3d 1006 (9th Cir. 2005) ...............................................................................3

20 *In re DDI Corp. Sec. Litig.*,
        2005 U.S. Dist. LEXIS 28216
21      (C.D. Cal. July 20, 2005) .......................................................................20, 25, 29

22 *In re Facebook, Inc.*,
        986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................ *passim*
23

24 *In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
        352 F. Supp. 2d 429 (S.D.N.Y. 2005)..................................................................27
25

26 *In re Nat'l Golf Props., Inc. Sec. Litig.*,
        2003 WL 23018761
27      (C.D. Cal. Mar. 19, 2003) ....................................................................................27

28

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                                        - iii -

1

2                                                                                          **Page**

3

*In re OPUS360 Corp. Sec. Litig.*,
4       2002 U.S. Dist. LEXIS 18558
5       (S.D.N.Y. Oct. 2, 2002) ..............................................................................26, 28

6   *In re OSG Sec. Litig.*,
        971 F. Supp. 2d 387 (S.D.N.Y. 2013)..................................................................28
7

8   *In re Portal Software, Inc. Sec. Litig*,
        2006 U.S. Dist. LEXIS 61589
9       (N.D. Cal. Aug. 17, 2006)....................................................................................26

10  *In re Proxima Corp. Sec. Litig.*,
        1994 U.S. Dist. LEXIS 21443
11      (S.D. Cal. May 4, 1994) .......................................................................................27

12  *In re Prudential Sec. Ltd. P'ships Litig.*,
        930 F. Supp. 68 (S.D.N.Y. 1996) ....................................................................4, 25
13

14  *In re Shoretel Inc. Sec. Litig.*,
        2009 U.S. Dist. LEXIS 11151
15      (N.D. Cal. Feb. 2, 2009)..........................................................................................3

16  *In re Sirrom Capital Corp. Sec. Litig.*,
        84 F. Supp. 2d 933 (M.D. Tenn. 1999).................................................................27
17

18  *In re Stac Elecs. Sec. Litig.*,
        89 F.3d 1399 (9th Cir. 1996) ...........................................................................24, 25
19

20  *In re Stone & Webster, Inc., Sec. Litig.*,
        253 F. Supp. 2d 102 (D. Mass 2003) ......................................................................8
21

22  *In re Stratosphere Corp. Sec. Litig.*,
        1 F. Supp. 2d 1096 (D. Nev. 1998).......................................................................27

23  *In re Sturm, Ruger & Co. Sec. Litig.*,
        2011 U.S. Dist. LEXIS 11341
24      (D. Conn. Feb. 7, 2011) ........................................................................................23

25  *In re Thornburg Mortg., Inc.*,
        683 F. Supp. 2d 1236 (D.N.M. 2010) .................................................................4, 5
26

27  *In re Van Der Moolen Holding N.V. Sec. Litig.*,
        405 F. Supp. 2d 388 (S.D.N.Y. 2005).....................................................................9

28

1

2                                                                                                **Page**

3

4   *In re Vivendi Universal, S.A. Sec. Litig.,*
       381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................26, 28

5   *J&R Mktg. v. GMC,*
       549 F.3d 384 (6th Cir 2008) ...................................................................................14

6

7   *Johns Hopkins Univ. v. Hutton,*
       422 F.2d 1124 (4th Cir. 1970) .................................................................................29

8   *Johnson v. City of Shelby,*
       _U.S._, 135 S. Ct. 346 (2014)...............................................................................13

9

10  *Joseph v. Wiles,*
       223 F.3d 1155 (10th Cir. 2000) ..............................................................................23

11

12  *Kensington Capital Mgmt. v. Oakley, Inc.,*
       1999 U.S. Dist. LEXIS 385
13     (C.D. Cal. Jan. 14, 1999) .......................................................................................27

14  *Krim v. Coastal Physician Grp., Inc.,*
       81 F. Supp. 2d 621 (M.D.N.C. 1998) .......................................................................8

15

16  *Lane v. Page,*
       581 F. Supp. 2d 1094 (D.N.M. 2008) .....................................................................18

17  *Litwin v. Blackstone Grp., L.P.,*
       634 F.3d 706 (2d Cir. 2011)........................................................................... *passim*

18

19  *Livid Holdings Ltd v. Salomon Smith Barney, Inc.,*
       416 F.3d 940 (9th Cir. 2005) ....................................................................................3

20

21  *Macdonald v. Ford Motor Co.,*
       2015 U.S. Dist. LEXIS 151277
22     (N.D. Cal. Nov. 2, 2015)........................................................................................21

23  *Mallen v. Alphatec Holdings, Inc.,*
       861 F. Supp. 2d 1111 (S.D. Cal. 2012)....................................................................27

24

25  *Matrixx Initiatives, Inc. v. Siracusano,*
       563 U.S. 27 (2011).............................................................................................20, 21

26  *Nieman v. Duke Energy Corp.,*
       2013 U.S. Dist. LEXIS 110693
27     (W.D.N.C. July 26, 2013) .................................................................................18, 26

28

1

2                                                                                               **Page**

3

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
4      *_U.S._,* 135 S. Ct. 1318 (2015) ................................................................. *passim*

5    *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,*
6      681 F.3d 114 (2d Cir. 2012) ...................................................................... 11, 12

7    *Pinter v. Dahl,*
       486 U.S. 622 (1988) ....................................................................................... 26

8
     *Provenz v. Miller,*
9      102 F.3d 1478 (9th Cir. 1996) ........................................................................ 10

10   *Rombach v. Chang,*
11     355 F.3d 164 (2d Cir. 2004) .............................................................................. 9

12   *Rubke v. Capitol Bancorp, Ltd.,*
       551 F.3d 1156 (9th Cir. 2009) ..................................................................... 8, 17

13
     *Schuh v. HCA Holdings, Inc.,*
14     947 F. Supp. 2d 882 (M.D. Tenn. 2013) ...................................................... 12, 14

15   *SEC v. Ralston Purina Co.,*
16     346 U.S. 119 (1953) ....................................................................................... 18

17   *Shaw v. Digital Equip. Corp.,*
       82 F.3d 1194 (1st Cir. 1996) ........................................................................... 18

18
     *Silverstrand Invs. v. AMAG Pharm., Inc.,*
19     707 F.3d 95 (1st Cir. 2013) ....................................................................... 12, 20

20   *Smolen v. Deloitte, Haskins & Sells,*
21     921 F.2d 959 (9th Cir. 1990) .......................................................................... 29

22   *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
       2001 WL 1111508
23     (S.D.N.Y. Sept. 20, 2001) .............................................................................. 27

24   *Stubblefield v. City of Novato,*
       2016 U.S. Dist. LEXIS 5662
25     (N.D. Cal. Jan. 15, 2016) ............................................................................... 13

26   *United States ex rel. Lee v. Corinthian Colls.,*
27     655 F.3d 984 (9th Cir. 2011) .................................................................. 6, 21, 22

28

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                              - vi -

1
2                                                                                                      **Page**
3
4  *Wilson v. Merrill Lynch & Co.*,
      671 F.3d 120 (2d Cir. 2011) ..................................................................................................4
5
6  *Winslow v. BancorpSouth, Inc.*,
      2011 U.S. Dist. LEXIS 45559
      (M.D. Tenn. Apr. 26, 2011) ................................................................................................9
7      **STATUTES, RULES AND REGULATIONS**
8
   15 U.S.C.
9      §77k ........................................................................................................................... *passim*
       §77l(a)(2) ................................................................................................................... *passim*
10     §77o ...........................................................................................................................29
11  Federal Rules of Civil Procedure
12     Rule 8 ...........................................................................................................................13
       Rule 8(a) ........................................................................................................................3
13     Rule 12(b)(6) ..................................................................................................................3
       Rule 12(g)(2) ..........................................................................................................2, 29
14
15  17 C.F.R.
       §229.303 .................................................................................................................6 10
16     §229.303(a)(1) ........................................................................................................11, 13
       §229.303(a)(2) ........................................................................................................11, 13
17     §229.303(a)(5) ........................................................................................................11, 20
       §229.303(b)(7) ..............................................................................................................11
18     §229.503 .......................................................................................................................10
       §229.504 .......................................................................................................................23
19     §229.512 .......................................................................................................................10
       §229.512(a)(1)(ii) .........................................................................................................18
20     §230.159A ..............................................................................................................27, 28
21     §230.159A(a) ................................................................................................................27
       §230.303(a)(3) ..............................................................................................................11
22     §230.408 ..........................................................................................................10, 17, 19
23     §230.408(a) ............................................................................................................15, 17
       §230.411 ..........................................................................................................10, 17, 19
24     §230.411(d) ..................................................................................................................17
       §230.415 .........................................................................................................2, 10, 18
25     §230.430B(f)(2) ...........................................................................................................17
       §230.508 .......................................................................................................................11
26
27
28

1158379_1

1    Plaintiffs Cobalt Partners, LP, Cobalt Partners II, LP, Cobalt Offshore Master Fund, LP and

2    Cobalt KC Partners, LP (collectively "Cobalt") hereby submit this consolidated brief in opposition to

3    the motions to dismiss filed by the Individual Defendants (Dkt. No. 42, "Mot." or "Motion") and

4    Alejandro Hernandez (Dkt. No. 45, "Hernandez Mot."), and the Underwriter Defendants' joinder in

5    the Individual Defendants' Motion (Dkt. No. 44).[1]

6    **I.     INTRODUCTION**

7    Cobalt purchased newly-issued "perpetual convertible preferred" SunEdison, Inc. ("SUNE"

8    or the "Company") securities in an offering (the "Offering") that took place on August 18, 2015.

9    ¶82.  The securities had an annual 6.75% dividend, no maturity date, and could be converted at any

10   time to SUNE common shares at a designated exchange rate.  ¶80.  At the time of the Offering and at

11   the time of Cobalt's purchases, SUNE's financial condition appeared to be strong, with billions of

12   dollars in liquidity on its balance sheet to carry out its plans to acquire and develop large-scale solar

13   and renewable energy projects.  ¶¶71-75, 81.

14   SUNE's liquidity and financial strength was critical to the success of its business plans,

15   which envisioned a constant stream of projects that would be developed and then sold (or "dropped

16   down") to SUNE subsidiaries, called "yieldcos," which would function like utilities, operating the

17   projects and returning 85% or more of their cash flows to SUNE and minority investors as dividends.

18   ¶¶37-48.  The success of this strategy depended on SUNE's ability to access capital at favorable

19   rates in order to generate a positive spread between its project financing rates and the rates of return

20   on those projects sufficient to support forecast dividends.   ¶¶46-48.  Disclosure that SUNE's

21   liquidity was deteriorating or that its borrowing costs were rising would have caused significant

22   concern to investors, including Cobalt.  *See, e.g.*, ¶¶3, 48-49, 64, 70, 72-74, 78, 84-85, 89-91, 97,

23   103-104.

24

25   ───────────────

[1]   As used herein, the terms "Individual Defendants" and "Underwriter Defendants" have the same
26   meaning as used in the briefs submitted by those defendants. *See* Dkt. No. 42 at 1 (ECF pg. 3 of 30);
      Dkt. No. 44 at 1 n.1).  This brief does not respond to the arguments made by Hernandez that have
27   since been withdrawn. *See* Dkt. No. 55. Throughout this brief, emphasis is added and citations have
      been omitted unless otherwise stated.  "¶_" refers to paragraphs in Cobalt's Complaint for Violations
28   of the Securities Act of 1933 (the "Complaint").  Dkt. No. 1-1.

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                                     - 1 -

1   Unbeknownst to Cobalt (or other investors), SUNE's liquidity had already started to

2   deteriorate before the Offering took place.  ¶¶49, 66-78.  On or about August 7, 2015, SUNE had

3   breached the debt covenants in a $410 million margin loan (the "Margin Loan Breach") it had taken

4   out as part of a $2.4 billion loan package put together to fund the January 2015 acquisition of First

5   Wind LLC, a developer and operator of wind power projects.  ¶¶50-55, 76-77.  Three days later, on

6   August 11, 2015, SUNE took out a $169 million loan from one of the Offering underwriters,

7   Goldman Sachs & Co., to cure the breach, paying 9.25% interest and a 5.3% loan origination fee,

8   equating to an effective interest rate of 15% (the "15% Goldman Loan").  ¶67.  The effective rate

9   was more than 14% over the prevailing LIBOR rate, a spread that was 10%-13% higher than the

10  spread on any loan reflected on SUNE'S balance sheet at the time of the Offering.  *Id.*

11  Six days *after* the 15% Goldman Loan closed, SUNE issued a prospectus supplement for the

12  Offering (the "Prospectus"), by which it sold $650 million of the perpetual preferred convertible

13  securities to the investing public.[2]  ¶¶80-82.  Neither the Margin Loan Breach nor the 15% Goldman

14  Loan were disclosed in the Prospectus, or anywhere else, before the Offering was completed.  ¶¶68,

15  77, 81.  Together, the Margin Loan Breach and 15% Goldman Loan were manifestations of a

16  significant deterioration in SUNE's liquidity that, if disclosed, would have revealed significant risks

17  to SUNE's financial condition and future prospects and dissuaded many investors, Cobalt among

18  them, from purchasing the securities sold in the Offering.  *E.g.*, ¶¶70, 78, 81-83.

19  Cobalt has brought claims for damages under §§11, 12(a)(2) and 15 of the Securities Act of

20  1933 (the "Securities Act") against SUNE, SUNE's former officers and directors, and the

21  underwriters in the Offering for the negligent failure to disclose the Margin Loan Breach, the 15%

22  Goldman Loan and the worsening liquidity condition reflected by those events in the Offering

23  Documents.

24

25

26  [2]   The Prospectus was issued pursuant to Item 512 of SEC Regulation S-K based on an earlier-filed
27  shelf registration statement issued pursuant to SEC Rule 415.  ¶80.  Together, the shelf registration
    statement, the original prospectus, and the prospectus supplement comprised the Offering
28  Documents for the Offering.  *Id.*

## II.     ARGUMENT

In deciding a Rule 12(b)(6) motion to dismiss, the Court must "'accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs.'" *In re Daou Sys.*, 411 F.3d 1006, 1013 (9th Cir. 2005).   A plaintiff can support a claim "by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).   Courts should not make factual determinations on a motion to dismiss. *E.g.*, *Livid Holdings Ltd v. Salomon Smith Barney, Inc*., 416 F.3d 940, 950 (9th Cir. 2005).

Pursuant to the Securities Act, defendants are liable under §11 where "'(1) . . . the registration statement contained an omission or misrepresentation, and (2) the omission or misrepresentation was material.'" *Daou*, 411 F.3d at 1027.   Section 11 "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering . . . §11 places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).   Securities Act claims are subject to Rule 8(a), where plaintiff need only "'provide a "short and plain statement of the claim showing that [he] is entitled to relief."'" *In re Shoretel Inc. Sec. Litig*., 2009 U.S. Dist. LEXIS 11151, at *5-*6 (N.D. Cal. Feb. 2, 2009).   "'This is not an onerous burden. Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests.'" *Id.* at *6.   As set forth below, Cobalt has satisfied its burden to adequately plead Securities Act claims against defendants.

### A.     The Omitted Information Was Not Disclosed

Defendants rest their Motion largely on their mistaken contention that the information that plaintiffs allege was omitted from the Prospectus was, in fact, disclosed.   Mot. at 5-10.   But in making this argument the Motion simply ignores the alleged facts that: (i) the breach of the Margin Loan occurred, and the 15% Goldman Loan used to cure it was signed, ***before*** the Offering took place and ***before*** the Prospectus was filed with the SEC or became effective; (ii) neither the breach nor the loan was disclosed until ***after*** the Offering took place and the new securities were issued; and (iii) the Margin Loan Breach and the 15% Goldman Loan used to cure it would have revealed that

SUNE's liquidity and financial condition was not as represented in the Prospectus.  *E.g.*, ¶¶70, 78, 122.

### 1.    Neither the Margin Loan Breach nor the 15% Goldman Loan Used to Cure It Was Disclosed Prior to the Offering

Defendants make no attempt to argue that either the Margin Loan Breach or the 15% Goldman Loan were disclosed before the Offering.  For good reason – they weren't.  ¶121.  Instead, defendants obfuscate the issues by arguing throughout the Motion that Cobalt could not have been misled because the **risk** of a Margin Loan Breach and higher borrowing rates had been disclosed, even if the actual manifestation of those risks was not.  Defendants are incorrect.  "'Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'"  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011); *see also In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[S]omeone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away" is liable for the harm that follows).

Defendants misapprehend the Complaint in suggesting that plaintiffs' claim is based upon a contention that SUNE was required to disclose the contractual terms that would have permitted investors to determine for themselves the specific date on which the Margin Loan would be breached.  *See* Mot. at 7.  This lawsuit arises from defendants' failure to disclose that SUNE had breached the debt covenants in one of its loans and borrowed funds at an effective rate of 15% to cure it.  ¶¶121-122.  Had defendants disclosed these facts, Cobalt would not have purchased the securities issued in the Offering.  ¶83.  While disclosure of all the terms of the Margin Loan might have prevented Cobalt and other investors from being misled about when that agreement was breached, SUNE did not do so, nor does this case turn on whether those terms were required to be disclosed, as defendants surmise.[3]  Rather, it is defendants' failure to disclose the **breach**, **and** the high-interest loan taken out to cure it, that gives rise to liability here.

---

[3]   Moreover, even if the issue were relevant, the case on which defendants rest their argument is distinguishable because it arose from the failure to disclose that the defendant's agreements generally contained terms (cross-default provisions) of a type that were well-known and commonplace in the marketplace, and the breach of those terms occurred **after** the date of the offering.  *In re Thornburg Mortg., Inc.*, 683 F. Supp. 2d 1236, 1257-58 (D.N.M. 2010); *see id.* at

1    Defendants' related contention that investors could have figured out for themselves that the

2    Margin Loan had been breached before the Offering similarly lacks factual support.  The Complaint

3    alleges that information sufficient to permit Cobalt (or any other investor) to do so was ***not***

4    disclosed.  ¶¶53-54.  The Motion tacitly concedes this point.  Mot. at 8.  As defendants concede, at

5    best investors could only get a "rough[]" "approximation" of when a margin call might be triggered.

6    ¶8:20 & n.3.  Without knowing the specific collateral that had been pledged or the terms of the

7    undisclosed side letter governing the loan covenants, investors had no way of knowing that the loan

8    had been breached before the Offering took place.  ¶¶53-54.  The allegation that the breach was

9    triggered no later than August 7, 2015 – which defendants perjoratively characterize as a mere

10   "hypothesis" – is based not just on multiplying the maximum number of collateral shares that might

11   have been pledged by the price of TerraForm Power, Inc. ("TERP") stock, but also on the timing and

12   amount of the (undisclosed) 15% Goldman Loan used to cure the breach.  *See* ¶¶52, 78 (loan was

13   closed within 2-business-day cure period for debt covenant breach).

14   Importantly, it was not just the undisclosed breach of the loan covenant that misled investors,

15   but what SUNE had done to cure it.  Cobalt and other investors were unaware that SUNE would

16   have to ***borrow*** funds at ***above-market*** rates to cure the Margin Loan breach because it lacked

17   sufficient existing liquidity to cure the breach on its own.  Rather, based on the description of the

18   loan covenants provided, as well as the representations about the strength of SUNE's liquidity (in the

19   Prospectus and in numerous public statements before the Offering), investors expected that, if a

20   breach occurred, SUNE would cure it simply by posting more TERP shares as collateral – not by

21   being in such dire straits that it would be forced to borrow funds at an extraordinary effective rate to

22   avoid a default.  *See* ¶84 (quoting post-Offering UBS analyst report speculating margin call had been

23   made and assuming, based on SUNE's prior disclosures, that it had been cured by pledging

24   additional shares).

25   1244 (cross-default triggered on Feb. 28, 2008); *id.* at 1243, 1256 (claim based on failure to disclose
26   existence of terms in April 19, 2007 document incorporated into prospectus for May 4, 2007
     offering).  The Complaint here does not arise from an alleged failure to disclose that SUNE's
27   borrowings were generally subject to debt covenants, but from the failure to disclose the breach of
     one of those covenants that took place ***before*** the Offering and could not have been detected without
28   disclosure of the unique contract terms specific to that loan.  ¶¶50-55, 76-83.

1

2. **SUNE's Financial Statements Did Not Disclose the Margin Loan Breach, 15% Goldman Loan, or the Weakened Liquidity Reflected by Those Events**

2

3       Defendants also incorrectly assert that Cobalt cannot claim to have been misled by anything

4   the Prospectus said about SUNE's liquidity because SUNE's financial statements were purportedly

5   correct.  Mot. at 9-10.  This argument fails as well, because it ignores Cobalt's allegations that

6   SUNE's financial statements presented an inaccurate and, at best, confusing picture of its liquidity.

7   It also fails because even assuming, *arguendo*, that the financial statements were technically

8   accurate, that would not relieve defendants from their obligation to disclose the Margin Loan Breach

9   and 15% Goldman Loan, or the worsening liquidity condition that was reflected by those events –

10  none of which was revealed by or apparent from SUNE's financial statements.  *See In re Facebook,*

11  *Inc.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) (half-truths violate the securities laws; 17 C.F.R.

12  §229.303.

13      Defendants make no effort to explain where or how SUNE's financial statements disclosed

14  the information that Cobalt alleges was omitted from the Prospectus.  For good reason – they didn't.

15  Defendants' conclusory argument rests entirely on their citation to four pages excerpted from

16  SUNE's 2Q15 Report on Form 10-Q and FY14 Report on Form 10-K.  Mot. at 9.  Yet nowhere do

17  any of the cited pages disclose SUNE's non-compliance with debt covenants in its borrowing

18  agreements, the terms of the loan taken out to cure the breach, or the sufficiency of its liquidity in

19  light of those events – nor do defendants even attempt to explain where or how they do.[4]

20

21  [4]   Page 7 of SUNE's 2Q15 10-Q report (Ex. C) merely contains SUNE's balance sheet, which simply identifies the total amount of SUNE's debt (not including the Goldman Loan).  But knowing

22  the amount of debt on SUNE's balance sheet told investors nothing about whether it could be accessed to meet the Company's operating needs, or whether SUNE was then in compliance with the

23  terms of its borrowing agreements.  The citation to "Ex. E at 47 & pages 40-41 of Exhibit 13" is unclear, as page 47 contains no relevant information.  Assuming defendants meant to cite pages 84-

24  85 of the exhibit, that is simply SUNE's cash flow statement as of December 31, 2014, which told investors nothing about the state of SUNE's liquidity or cash flow needs on August 18, 2015.  More

25  to the point, defendants' arguments are based on disputed issues of fact that are inappropriately raised at this stage of the case.  Defendants recognize, for example, that the Complaint alleges that

26  SUNE's financial statements mischaracterized the Margin Loan as non-recourse, when in fact it was recourse debt.  ¶55.  Defendants' footnoted contention (Mot. at 9 n.4) that the character of the loan

27  changed as a result of post-Offering amendments merely raises factual issues for discovery based on materials outside of the four corners of the Complaint.  *See United States ex rel. Lee v. Corinthian*

28  *Colls.*, 655 F.3d 984, 998 (9th Cir. 2011) (facts outside pleadings may not be considered on motion to dismiss).

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                                           - 6 -

1    The Margin Loan Breach and 15% Goldman Loan were not misleading, as defendants'

2  surmise, merely because they concealed an additional $169 million in debt.  They were misleading

3  because they omitted material facts regarding existing conditions that posed significant risks to

4  SUNE's ability to fund the on-going operations of its business, to maintain compliance with its

5  existing loans, and to access funds at interest rates low enough to achieve an internal rate of return

6  that would allow SUNE to generate a profit on projects it was then committed to develop and which

7  were necessary to achieve its forecast growth.  ¶¶70, 78, 122.  Defendants' related assertion that

8  investors could not have been misled because SUNE had disclosed increases in its overall debt (Mot.

9  at 14) similarly misses the mark.  That SUNE had borrowed funds tied to (and secured by) specific

10  development plans or projects did not alert investors that SUNE lacked sufficient working capital to

11  run its business, and had taken out a high interest loan to cure the breach of the debt covenants in one

12  of its significant loans.  To the contrary, the Prospectus specifically assured investors that SUNE's

13  financial statements had been prepared "assuming . . . continued compliance with the financial and

14  other covenants in our existing credit facilities and other financing arrangements" and, based on

15  those statements, SUNE's liquidity was reasonably believed to be sufficient to meet its near-term

16  needs.  Omitting to disclose the Margin Loan Breach and 15% Goldman Loan rendered these

17  assurances – and SUNE's financial statements – misleading.  ¶125(b).

18    Defendants' argument that SUNE's financial statements contained all the information Cobalt

19  or any other investor needed to understand the truth about the Company's liquidity is further

20  debunked by the statements defendant Ahmad Chatila (SUNE's CEO) made on an October 7, 2015

21  investor call, where, in discussing SUNE's liquidity condition, he: (i) admitted that "SunEdison's

22  P&L and balance sheet are hard to read and we fully recognize that"; and (ii) acknowledged that the

23  Company needed to "improve our investor disclosure, reporting and transparency to shed light on the

24  quality of our business."  ¶97; *see also* ¶¶84-85, 90 (earlier analyst reports reflecting confusing and

25  incomplete nature of SUNE's financial disclosures).[5]  SUNE's inability to file its FY15 financial

26  statements amid an internal investigation sparked by whistleblower reports questioning the accuracy

27  ―――――――――――――――

28  [5]    At the time of this call, the 2Q financial statements that defendants rely upon for their argument
were the most recent financials that had been issued by the Company.

of SUNE's representations about its liquidity, and its warning to investors that the Company "may be required to reassess [its] liquidity position . . . including whether the Company may require greater liquidity than previously anticipated and/or whether the sources are sufficient to meet its requirements" further undercuts defendants' arguments based on the purported reliability of SUNE's financials.[6] ¶107.

Even if SUNE's financial statements *were* accurate and not misleading, the two cases cited in the Motion do not support defendants' contention that dismissal is required "where a company properly discloses its financial position in its financial statements." Mot. at 9. Neither case dismissed claims because the financial statements were accurate. Both dismissed claims because – unlike here – the negative information alleged to have misled investors had been ***disclosed***. In *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 126 (D. Mass 2003), the defendant's financial statements already painted a "grim liquidity picture," and the company had disclosed that it had breached the covenants in its lending agreements, its bank account was overdrawn, and it had obtained a new line of credit that would require it to incur additional debt to keep operating. In *Krim v. Coastal Physician Grp., Inc.*, 81 F. Supp. 2d 621, 629 (M.D.N.C. 1998), the defendant repeatedly told investors that the losses reported on its financial statements had resulted from problems with its billing systems, such that telling investors that its billing systems were "a mess" would have added nothing to the total mix of information provided to investors.[7] SUNE made no remotely similar disclosures here, nor do any of the materials relied upon by defendants show that it did.

### 3. Warning of Risks that Might Arise a Year or More into the Future Does Not Alert Investors that the Warned-of Events Have Already Occurred

Defendants' reliance on SUNE's risk warnings to show that the truth was disclosed (Mot. at 9) fares no better, because, again, warning that something ***might*** occur is insufficient to alert investors that it already has. *E.g.*, *Facebook*, 986 F. Supp. 2d at 516 (collecting cases). Here,

---

[6]   SUNE never did file its FY15 Report on Form 10-K. The SEC has since launched an investigation into the accuracy of SUNE's prior misrepresentations about its liquidity.

[7]   *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009), cited elsewhere by defendants, similarly arose (in the section cited by defendants) from the failure of a prospectus to disclose market trends that were widely reported and publicly available. *See* Mot. at 6, 13.

1    defendants don't even show that the risks were disclosed.  Instead, they cite generally to page 61 of

2    SUNE's 2Q15 10-Q report, but tellingly make no effort to identify the cautionary language they are

3    relying on for dismissal.[8]  Defendants appear to be relying on the statement in the Prospectus that,

4    although SUNE's liquidity was believed to be adequate for the next 12 months, the Company would

5    need to raise additional liquidity in the future.  But this case arises from the fact that SUNE's

6    liquidity was **_not_** sufficient for the next 12 months – not that it might not be able to borrow

7    additional funds beyond that time to keep its growth engine running.  *See infra* at §II.B.2.  Moreover,

8    SUNE warned only that "we **_may_** not be able to maintain compliance with our existing debt

9    covenants" and "additional financing . . . **_could_** be costly to secure and maintain and **_could_**

10   significantly impact our earnings and our liquidity."  ¶124.  But representing that SUNE **_could_**

11   violate its debt covenants or pay higher interest rates a year hence if its plans did not turn out as

12   expected did nothing to warn investors that SUNE had **_already_** breached its debt covenants and was

13   **_already_** paying higher interest rates as a result.  *E.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir.

14   2004); *Facebook*, 986 F. Supp. 2d at 511; *Winslow v. BancorpSouth, Inc.*, 2011 U.S. Dist. LEXIS

15   45559, at *48-*49 (M.D. Tenn. Apr. 26, 2011).

16          Defendants' assertion (Mot. at 10) that questions raised by some investors over SUNE's

17   liquidity following the announcement of the Vivint Solar acquisition demonstrate that the truth about

18   its liquidity problems was disclosed before the Offering fares no better.  As detailed in the Complaint

19   (and ignored entirely in the Motion), even though SUNE had told Vivint during negotiations that it

20   lacked the liquidity to complete that transaction on its stated terms (¶61), defendants consistently and

21   repeatedly responded to investor questions over the sufficiency of SUNE's liquidity with false

22   assurances that it **_already_** had adequate resources to close that transaction and address all of its other

23   needs over the next 12 months, and any fears to the contrary were unfounded.  ¶¶64, 72-75, 79; *cf.*

24   ¶¶93, 103-108.  That some investors may have disbelieved those assurances and sold shares based on

25

_____

26   [8]    In fact, page 61 of the report does not even contain SUNE's risk disclosures.  Rather, it contains
     a portion of the liquidity disclosures at pages 60-66 that were incorporated into the Prospectus, and
27   that Cobalt alleges were misleading.  *See* ¶124; *cf. In re Van Der Moolen Holding N.V. Sec. Litig.*,
     405 F. Supp. 2d 388, 399-400 (S.D.N.Y. 2005) (risk warnings are actionable misrepresentations
28   where warned-of risks have already occurred).

1   such concerns does not, as defendants assert, establish, as a matter of law, that the market was

2   "informed" or that defendants' assurances were "truthful." *E.g.*, *Provenz v. Miller*, 102 F.3d 1478,

3   1493 (9th Cir. 1996); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  More to the

4   point, it does not excuse defendants from telling the truth in the Prospectus, or establish, as a matter

5   of law *or* fact, that *Cobalt* was not misled by the misrepresentations and omissions about SUNE's

6   liquidity that appeared in the Prospectus.

7           **B.      Cobalt Was Misled by Defendants' Failure to Disclose the Margin
                      Loan Breach and the 15% Goldman Loan, and the Deteriorating
8                     Liquidity Revealed by Those Events**

9           SUNE was required to disclose the Margin Loan Breach and the 15% Goldman Loan, and the

10  deteriorating liquidity they reflected, in the Prospectus because SEC rules mandated disclosure and

11  because disclosure was necessary to prevent the statements contained in the Prospectus from being

12  misleading to investors.  That SUNE incorporated outdated and misleading information from

13  SUNE's 2Q15 Report on Form 10-Q into the Prospectus provides no excuse for failing to disclose

14  the truth to investors, and no ground for dismissal.  "Congress adopted §11 to ensure that issuers

15  'tell[] the whole truth' to investors."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

16  *Pension Fund*, _U.S._, 135 S. Ct. 1318, 1331 (2015).

17          **1.      SEC Regulations Required SUNE to Disclose the Margin Loan
                      Breach, 15% Goldman Loan and Weakened Liquidity in the
18                    Prospectus**

19          SEC regulations required SUNE to disclose the Margin Loan Breach, 15% Goldman Loan

20  and diminished liquidity in the Prospectus.  17 C.F.R. §§229.303, 229.503, 229.512, 230.408,

21  230.411, 230.415; *see also* SEC Form S-3, Items 11, 12, 17.  While the Motion acknowledges that

22  defendants had a duty to disclose the information required by SEC regulations (Mot. at 12), it largely

23  ignores the specific requirements of the regulations or their application to the facts omitted from the

24  Prospectus.

25          A prospectus for a public offering of the sale of securities is required to include the

26  information set forth in Item 303 of Regulation S-K.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706,

27  716 (2d Cir. 2011).  Item 303 required the Prospectus to include all material information about

28

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                          - 10 -

1    SUNE's liquidity[9] and capital resources, including "any known trends or any known demands,

2    commitments, events or uncertainties that will result in or that are reasonably likely to result in the

3    registrant's liquidity increasing or decreasing in any material way," and "any known material trends,

4    favorable or unfavorable, in the registrant's capital resources."  17 C.F.R. §229.303(a)(1)-(2).  "If a

5    material deficiency is identified," the Prospectus is required to "indicate the course of action that the

6    registrant has taken or proposes to take to remedy the deficiency."  *Id*. §(a)(1).  The Prospectus is

7    also required to "Indicate any expected material changes in the mix and relative cost of" capital

8    resources.  *Id*. §(a)(2).  Item 303 also required that the Prospectus include a table showing SUNE's

9    contractual debt obligations or "disclose material changes outside the ordinary course of the

10   registrant's business" in those obligations.  17 C.F.R. §229.303(a)(5), (b)(7).  In addition, SEC Rule

11   508 required disclosure of SUNE's agreements and  arrangements with its underwriters.  17 C.F.R.

12   §230.508.  All of these rules required the Margin Loan Breach and 15% Goldman Loan to be

13   disclosed in the Prospectus.

14        Item 303 further required the Prospectus to describe, *inter alia*, "any unusual or infrequent

15   events or transactions or any significant economic changes that materially affected the amount of

16   reported income from continuing operations" and "any known trends or uncertainties that have had

17   or that the registrant reasonably expects will have a material favorable or unfavorable impact on net

18   sales or revenues or income from continuing operations."  17 C.F.R. §230.303(a)(3).  Item 303

19   requires disclosure even where a trend ***might*** materially impact future performance, or where the

20   impact cannot be determined.  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120-

21   21 (2d Cir. 2012).  These rules, too, required the omitted information to be disclosed.

22        The Prospectus did not do so.  Instead, the Prospectus attempted to meet these requirements

23   by incorporating the Reg. S-K disclosures in SUNE's August 6, 2015 Form 10-Q report, but failed to

24   update those disclosures by disclosing the Margin Loan Breach or the 15% Goldman Loan or the

25   impact of those events on SUNE's liquidity.  By failing to make these disclosures, defendants

26   violated Reg. S-K.  *Litwin*, 634 F.3d at 716; *see, e.g.*, *In re Children's Place Sec. Litig.*, 1998 U.S.

---

27   [9]    Instruction 5 to Item 303(a) states: "The term 'liquidity' as used in this Item refers to the ability

28   of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash."

1  Dist. LEXIS 22868, at *23-*31 (D.N.J. Sept. 4, 1998) (defendant violated Reg. S-K by failing to

2  disclose significant intra-quarter decline in performance in IPO Prospectus).  This in turn establishes

3  a *prima facie* case of §11 liability that precludes dismissal on the pleadings.  *E.g.*, *Silverstrand Invs.*

4  *v. AMAG Pharm., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013); *Schuh v. HCA Holdings, Inc.*, 947 F. Supp.

5  2d 882, 888-92 (M.D. Tenn. 2013).

6         Defendants nevertheless contend that dismissal is required based on the mistaken belief that

7  the Margin Loan Breach, 15% Goldman Loan, and worsening liquidity situation that those

8  undisclosed events foretold is not enough of a "trend" to trigger disclosure and, even if it were,

9  scienter is a required element of liability under the regulation.  Defendants are wrong on both counts.

10         Contrary to defendants' contentions, there is no fixed definition of or litmus test for

11  determining what constitutes a "trend" under Regulation S-K.  *Schuh*, 947 F. Supp. 2d at 891-92

12  ("[C]ontext matters, and what may not constitute a trend in one industry may signal a trend in

13  another.").[10]  Here, the facts pled establish the existence of a trend that was required to be disclosed.

14  SUNE's liquidity was rapidly diminishing even as its debt load was increasing.  SUNE had breached

15  one of its significant borrowing agreements, obtained an unusual, high-cost loan to cure the breach,

16  and needed to obtain substantial additional financing to complete acquisitions it had planned over the

17  next 12 months.  ¶¶61, 67, 76, 78.  These were not isolated circumstances or unrelated events.  These

18  events posed significant risks to SUNE's ability to continue executing its business plans, as well as

19  its continued financial viability.  Although these trends may have emerged over a matter of weeks or

20  months, time alone is not the measure of a trend.  *Schuh*, 947 F. Supp. 2d at 891-92; *see also*

21  *Panther Partners*, 681 F.3d at 122 (under Reg. S-K "disclosure obligations, like materiality under

22  the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or

23  quantitative inquiries").  The allegations are therefore sufficient to plead a violation of the trend

24  disclosure requirements of Regulation S-K.  *See, e.g.*, *Litwin*, 634 F.3d at 716-17; *Facebook*, 986 F.

25  Supp. 2d at 511-12; *Panther Partners*, 681 F.3d at 121-22.

---

26

27  [10]   Thus, defendants' reliance on *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL
148617 (S.D.N.Y. Jan. 14, 2010), is misplaced to the extent they read that case to mean that, in every

28  case, a trend must last for longer than two months to require disclosure under Regulation S-K.  *See*
*Schuh*, 947 F. Supp. 2d at 891 (rejecting *Blackmoss* on that ground).

1    Even if defendants were correct that these events were not sufficient to give rise to a "trend,"

2    they ignore that Regulation S-K also requires disclosure of "commitments, events or uncertainties"

3    that were reasonably likely to materially decrease liquidity and to "indicate the course of action that

4    the registrant has taken or proposes to take to remedy the deficiency."  17 C.F.R. §229.303(a)(1).

5    Plainly the breach of the Margin Loan was such an "event" and the 15% Goldman Loan was both a

6    "commitment" and an "action" that required disclosure as well.  Defendants also ignore that the 15%

7    Goldman Loan reflected a "material change[] in the mix and relative cost of" SUNE's capital

8    resources, which Regulation S-K also required to be disclosed in the Prospectus.  17 C.F.R.

9    §229.303(a)(2).  Thus, even if defendants' "trend" argument were correct (it isn't), that alone would

10   not excuse defendants' failure to disclose these conditions and events in the Prospectus.

11   Defendants' quibble that Cobalt's Complaint does not cite each of the specific provisions of

12   Regulation S-K that were violated (Mot. at 15:11-12) ignores that Rule 8 only requires the pleading

13   of facts, not legal theories or conclusions.  *See Johnson v. City of Shelby*, _U.S._, 135 S. Ct. 346,

14   346-67 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for

15   imperfect statement of the legal theory supporting the claim asserted.").  Here, the facts pled about

16   the Margin Loan Breach, the 15% Goldman Loan and SUNE's liquidity problems show a violation

17   of all of the foregoing provisions of Regulation S-K.  The Complaint pleads that the Prospectus

18   violated SEC disclosure rules (¶¶123, 131) and as their Motion aptly reflects, defendants understood

19   that a violation of that regulation had been pled.  Mot. at 15:6-9.  Thus, while Cobalt could (and, if

20   required to do so by the Court, will) amend its Complaint to specifically allege each of the

21   provisions of Regulation S-K that were violated by the Prospectus, such an amendment is not

22   necessary to sustain the Complaint.  *Id.*; *see also Stubblefield v. City of Novato*, 2016 U.S. Dist.

23   LEXIS 5662, at *10-*11 (N.D. Cal. Jan. 15, 2016) (rejecting assertion that plaintiffs needed to cite

24   specific statutory provisions in pleading).

25   Defendants are also mistaken in contending that Cobalt cannot rely on Regulation S-K

26   because it has disclaimed allegations of scienter.  Scienter for purposes of fraud is not the same as

27   knowledge under Regulation S-K.  An allegation grounded on a violation of Regulation S-K only

28   requires showing that the issuer of the securities had knowledge of the information that was omitted

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                                    - 13 -

1  from the Prospectus – not that each defendant knew or recklessly disregarded that, in the absence of

2  that information, investors were likely to be misled.   Even the principal case relied upon by

3  defendants, *J&R Mktg. v. GMC*, 549 F.3d 384 (6th Cir 2008), recognizes that, while a trend must be

4  known to be actionable under Regulation S-K, "Section 11 does not impose a further requirement of

5  knowledge, as a fraud action would" or require plaintiffs to prove (or plead) that the defendant knew

6  the undisclosed event would impact its liquidity or even knew that it had failed to disclose the event

7  in its registration statement.   *Id.* at 392; *see also Schuh*, 947 F. Supp. 2d at 887 (rejecting similar

8  contention that under *J&R Mktg.* Item 303 "impos[es] a heightened pleading standard with regard to

9  knowledge").   In *J&R Mktg.*, the claim was dismissed because the information was known only to

10  GM, not defendant GMAC – not because scienter was not alleged.  549 F.3d at 391.  In *Blackmoss*,

11  the complaint similarly failed to plead that the trend was known to the defendant.  2010 WL 148617,

12  at *9.  Here, there is no question that, before the offering took place, SUNE "knew" about the

13  Margin Loan Breach (by virtue of the notice provisions in the contract), the 15% Goldman Loan (by

14  virtue of signing the loan documents), and the inadequacy of its liquidity to complete the Vivint

15  acquisition (because that's what it told Vivint).   ¶¶52, 61, 67, 78.

16          Defendants' reliance on *Omnicare* to support the imposition of a scienter requirement is also

17  misplaced.  First, *Omnicare* deals with the requirements for establishing liability based on opinions

18  contained in Offering Documents, not the requirements under Regulation S-K.  Second, even with

19  respect to the actionability of opinions, *Omnicare* does not require plaintiffs to plead scienter.  The

20  portion of the opinion defendants rely upon dealt with pleading a claim of affirmative

21  misrepresentation – that defendants had lied about what they believed – as opposed to a claim like

22  that pled here premised on an omission to disclose facts undermining the basis for an opinion

23  included in offering documents.   *See id*. at 1327.[11]   Pleading an omission merely requires the

24  plaintiff to "identify[] one or more facts left out of [the] registration statement" that "would have

25

26

---

27  [11]    Even there, *Omnicare* does not hold that scienter is a required element.  It merely recognized that
plaintiffs there (as Cobalt here) had not challenged whether the belief was honestly held, citing their
28  disclaimer of scienter as evidence of that fact.  *Id.*

1  been material to a reasonable investor."[12]  *Id.* at 1333.  Cobalt has done so here.  *E.g.*, ¶¶61, 77-78,

2  121.

### 2.     The Omissions Rendered the Offering Documents Misleading

4           In addition to having an affirmative duty of disclosure under Regulation S-K, defendants also

5  were required to disclose the Margin Loan Breach and 15% Goldman Loan and SUNE's weakened

6  liquidity condition in order to prevent the other statements contained in the Prospectus from being

7  misleading to investors in the Offering.  17 C.F.R. §230.408(a); *see, e.g.*, *Facebook*, 985 F. Supp. 2d

8  at 522.  In addressing this issue, defendants assert that "[t]he analysis is different" depending upon

9  whether a misrepresentation is contained "in the Prospectus itself" or in a document that is

10  incorporated by reference into the Prospectus.  Mot. at 12.  Defendants are incorrect.  ***All*** of the

11  information that forms the Prospectus becomes a part of the Offering Documents and is actionable if,

12  as of the effective date of the Offering, it is materially false or misleading to investors in context

13  with the other information presented therein.  The analysis is the same whether the information is

14  printed on a page in the Prospectus or incorporated by reference into it from some other document.

15  *In re Am. Int'l Grp., Inc.*, 741 F. Supp. 2d 511, 539 (S.D.N.Y. 2010).

16           It is also well settled that in analyzing omissions or misrepresentations, offering documents

17  must be considered holistically taking into account all of the information presented therein.  *See*

18  *Facebook*, 986 F. Supp. 2d at 515.  Offering documents cannot be reduced to a series of unrelated

19  statements that are analyzed in isolation from one another.  Whether a statement is materially

20  misleading is a "fact-specific inquiry [that] should not focus solely on particular statements which,

21  taken separately, is literally true, but on 'whether defendants' representations, taken together and in

22  context, would have misled a reasonable investor about the nature of the [securities].'"  *Id.*

23

24

---

25  [12]  With respect to an opinion, the omitted facts must also "show[] that [defendant] lacked the basis

26  for making those statements that a reasonable investor would expect."  *Omnicare*, 135 S. Ct. at 1333.
Although the omissions alleged here meet this test as well (*infra* at 24), defendants do not argue the

27  point.  Instead, they rely on *Omnicare* more broadly in an attempt to establish a purported scienter
requirement for ***all*** Regulation S-K omissions, whether of opinion or not.  *Omnicare* imposes no

28  such requirement.

1

        **a.**      **Defendants Had a Duty to Update the Misleading**

                       **Information in SUNE's 2Q15 10-Q Report that Was**

2

                       **Incorporated into the Prospectus**

3          As discussed above, the Prospectus was required by Regulation S-K to describe SUNE's

4  liquidity and capital resources, and did so by incorporating the information from its August 6, 2015

5  Report on Form 10-Q by reference.  Defendants make no argument that these statements were not

6  misleading.  Indeed, they seek dismissal of claims arising from these misrepresentations based solely

7  on their contention that they had no duty to update the information in the 10-Q to reflect material

8  changes in SUNE's liquidity that had occurred after the date of that report, ***even if those events pre-***

9  ***dated the Offering***.  *See* Mot. at 11.  Because this argument is incorrect, defendants' Motion

10  provides no ground for dismissal of the claims arising from those misrepresentations.

11          The statements incorporated into the Prospectus from the 2Q15 Report on Form 10-Q told

12  investors that: (i) SUNE had sufficient existing sources of liquidity to support its operations for the

13  next 12 months, but would need to raise additional funds to support capital needs beyond that time;

14  and (ii) if the Company had difficulty raising additional funds in the future, or could not do so on

15  favorable terms, it might not be able to comply with the debt covenants in its borrowing agreements,

16  could be forced to pay higher interest rates, and its liquidity and earnings could suffer as a result.

17  ¶124.  The incorporated information specifically described SUNE's existing borrowing agreements,

18  including the Margin Loan, along with a detailed disclosure of the loan's debt covenants that

19  neglected to disclose anywhere that those covenants had been breached.  ¶127.  These disclosures

20  were materially misleading because by the time of the Offering the Margin Loan had already been

21  breached, SUNE was already paying significantly higher rates than it had paid in the past, and SUNE

22  lacked the liquidity it needed to complete the Vivint acquisition or meet its other forecast needs for

23  the 12 months after the Offering.  *See, e.g.*, *Omnicare*, 135 S. Ct. at 1331 ("An issuer must as well

24  desist from misleading investors by saying one thing and holding back another.").  Moreover, given

25  the detailed description of the Margin Loan covenants that was incorporated into the Prospectus

26  (¶127), any reasonable investor would have assumed from the absence of any disclosure that the

27  covenants ***had*** been breached that SUNE remained in compliance with the loan terms as of the date

28

1   of the Offering.  *See Omnicare*, 135 S. Ct. at 1330 (recognizing that investors expect and rely on

2   management's greater knowledge of and inquiry into internal conditions).

3          Defendants misapprehend the law on incorporation by reference in arguing that they had no

4   duty to disclose a breach that occurred on August 7, 2015 or a loan taken out on August 11, 2015 in

5   a Prospectus that became effective on August 18, 2015 simply because they chose to meet their

6   disclosure obligations by incorporating by reference an SEC report that was dated August 6, 2015.

7   Defendants cannot evade liability by contending it was impossible to disclose on August 6 events

8   that happened the next day or week, because the relevant date for testing the truth or falsity of the

9   information provided to investors is August 18, the day the Prospectus became effective.[13]   17

10  C.F.R. §230.430B(f)(2); *e.g.*, *Rubke*, 551 F.3d at 1164 ("A claim under section 11 based on the

11  omission of information must demonstrate that the omitted information existed ***at the time the***

12  ***registration statement became effective***."); *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc.*,

13  987 F. Supp. 2d 369, 374 (S.D.N.Y. 2013); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d

14  171, 183 (S.D.N.Y. 2003).

15         While the SEC permits issuers to incorporate previously-filed reports into a prospectus, its

16  rules do not relieve issuers from their duty to assure that the prospectus updates or corrects any

17  misleading information in those reports.  SEC Rule 411 provides that "[i]nformation shall not be

18  incorporated by reference in any case where such incorporation would render the statement

19  ***incomplete***, ***unclear*** or ***confusing***."  17 C.F.R. §230.411(d).  Likewise, SEC Rule 408 requires that

20  offering documents "shall" contain "such further material information, if any, as may be necessary to

21  make the required statements, in the light of the circumstances under which they are made, not

22  misleading."  17 C.F.R. §230.408(a).  Item 512 of Regulation S-K also requires that offering

23  documents include updated information to reflect "any facts or events . . . which, individually or in

24  the aggregate, represent a fundamental change in the information set forth in the registration

25

26  [13]   In their argument, defendants also refer to their inability to make a "public prediction on July 31,
    2015" that TERP's share price would fall.  Mot. at 11.  Defendants' point is unclear.  Even under

27  their (incorrect) contention, the relevant dates are August 6 (the date of the 10-Q) and August 18 (the
    date of the Prospectus), not July 31.

28

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                          - 17 -

1   statement." 17 C.F.R. §229.512(a)(1)(ii).[14]  Item 11(a) of the instructions to Form S-3 (the form

2   used for the shelf registration statement that authorized the Offering) similarly required the

3   supplemental Prospectus to describe "any and all material changes" in SUNE's affairs since the end

4   of FY14 that had not been described in a report on Form 10-Q. "The primary purposes of the

5   'material changes' disclosure requirement . . . is to ensure that the prospectus provides investors with

6   an *update* of the information required to be disclosed in the incorporated Exchange Act filings,"

7   including information required by Reg. S-K. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1205 (1st

8   Cir. 1996) (emphasis in original).

9         While this did not require SUNE to amend its 10-Q report, it did require it to update the

10   information contained therein by way of the Prospectus.  As Judge Easterbrook has explained: "A

11   registration statement and prospectus for a new issue of securities must be accurate when it is used to

12   sell stock, and not just when it is filed." *Gallagher v. Abbott Lab.*, 269 F.3d 806, 810-11 (7th Cir.

13   2001) (citing Item 512(a)).  This concept that registration statements must be truthful as of the date

14   of the transactions to which they pertain is consistent across the federal case law. *See, e.g.*, *Lane v.*

15   *Page*, 581 F. Supp. 2d 1094, 1122 (D.N.M. 2008) (directors had duty to amend proxy prior to

16   merger to reflect change in their intention to vote in favor of a merger); *Nieman v. Duke Energy*

17   *Corp.*, 2013 U.S. Dist. LEXIS 110693, at *22-*23 (W.D.N.C. July 26, 2013) (issuer was required to

18   correct registration statement prior to merger to reflect changes in its plans to retain current CEO).[15]

19

20   [14]   Item 512 identifies the information required to be included in prospectus supplements that, like
       the Prospectus at issue here, are filed for continuous offerings pursuant to an earlier-filed shelf
21   registration statement under SEC Rule 415.

22   [15]   *Lane* and *Nieman* are representative of cases requiring registration statements and similar SEC
       filings to be amended even ***after*** their effective date, where circumstances have changed materially
23   since the statement was filed but before the actions to which it pertains have been completed (as
       with, for example, a merger vote).  This case is even stronger because it is based on a failure to
24   include updated information in the Prospectus to reflect material changes in circumstances that had
       arisen ***before*** it became effective. To have it any other way would render registration statements
25   inherently unreliable by not assessing the accuracy of the disclosures with regard to the date
       shareholders acted, thus permitting investors to be misled. *See SEC v. Ralston Purina Co.*, 346 U.S.
26   119, 124 (1953) ("The design of the [Securities Act] is to protect investors by promoting full
       disclosure of information thought necessary to informed investment decisions."); *Omnicare*, 135 S.
27   Ct. at 1331 ("Were Omnicare right, companies would have virtual *carte blanche* to assert opinions in
       registration statements free from worry about §11.  That outcome would ill-fit Congress's decision to
28   establish a strict liability offense promoting 'full and fair disclosure' of material information.").

1    Thus, defendants were not permitted to rely on the outdated information in the 10-Q report which, as

2    outlined above, described the Margin Loan covenants and other borrowings but not the breach or the

3    high-interest loan taken out to cure it.  Rather, SUNE had a duty to disclose the updated information

4    in the Prospectus. *Gallagher*, 269 F.3d at 811 ("[T]he issuer must file and distribute an addendum to

5    that document bringing matters up to date. *See* Form S-3, Item 11.").  In the absence of disclosure of

6    that information, or the implications those events had for SUNE's liquidity and capital resource

7    requirements, the 10-Q report incorporated into the Prospectus was incomplete, unclear and

8    confusing, and rendered the statements in the report, as incorporated in the Prospectus, materially

9    misleading to investors in violation of SEC Rules 408 and 411 and Regulation S-K.

10         Finally, even if defendants were correct in their interpretation of the incorporation by

11    reference rules, their argument would still fail to support dismissal because it raises factual issues for

12    discovery as to when the breach occurred.  As explained above, based on the information disclosed

13    to date, the Complaint alleges that it appears that the breach occurred on ***or about*** August 7, and

14    could have occurred earlier. *Supra* at 5.  And, as defendants acknowledge, the 15% Goldman Loan

15    had been structured in July, perhaps in anticipation of the breach occurring. *See* Mot. at 12.  Thus,

16    defendants' argument that this case should be dismissed as a matter of law because they could not

17    "foretell the future" or because the Goldman loan was purportedly "still in its formative stages" at

18    the time the 10-Q report was filed merely raises issues for discovery.[16]  What it does not provide is

19    proper grounds to dismiss the Complaint.

20              **b.    Defendants' Contention that the Omissions Were
                       Immaterial Is Incorrect and Contradicts the Pleadings**

21

22         Defendants' arguments fare no better with respect to the alleged misrepresentations they do

23    attempt to confront in the Motion.  All of their arguments boil down to a challenge to the materiality

24    of the omissions.  These arguments are factually incorrect, contradict the pleadings, and, at most,

---

25    [16]   It bears emphasizing in this respect that lack of liquidity to complete the Vivint acquisition, the
26    breach of the Margin Loan, and the agreement to borrow funds from Goldman all arose between
      mid-June and early August, 2015, and by October 2015 SUNE had begun defaulting on its existing
27    obligations. ¶¶61, 76-78, 93.  Thus, this case is much different from the one relied on by defendants,
      which arose from the defendants' failure to predict "the inevitability of their bankruptcy some two
28    years down the road." *Firefighters Pension & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882, 897
      (E.D. La. 2014).

1   raise issues for discovery that cannot be decided at this stage.  *See, e.g.*, *Litwin*, 634 F.3d at 718

2   (plaintiffs have a "relatively minimal burden of stating a claim" under §§11 and 12(a)(2), and

3   "[w]here the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs

4   to state a claim is even lower"); *In re DDI Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 28216, at *41

5   (C.D. Cal. July 20, 2005) (to dismiss for lack of materiality, misstatements or omissions must be so

6   unimportant that reasonable minds could not differ on the question); *Feyko v. Yuhe Int'l, Inc.*, 2013

7   U.S. Dist. LEXIS 29905, at *14 (C.D. Cal. Mar. 5, 2013) ("Materiality is rarely appropriate to decide

8   at the motion to dismiss stage.").

9       As required by SEC rules, the Prospectus included a description of various lending

10   agreements SUNE had with the Offering Underwriters.  Although that portion of the Prospectus also

11   described the Margin Loan, like the discussion of Liquidity & Capital Resources incorporated from

12   the 2Q15 10-Q report, it did not disclose that the debt covenants on the loan had been breached or

13   that SUNE had borrowed $169 million at 15% from Goldman to cure it.  ¶129.  Neither did SUNE

14   disclose the breach or the new loan in its discussion of Recent Developments, which otherwise

15   appeared to provide a detailed, and apparently complete, disclosure of SUNE's recent borrowing

16   arrangements and other circumstances bearing on its liquidity.  ¶¶131-134.  Unable to argue that the

17   information was disclosed, defendants are left to contend that it didn't have to be because it was

18   unimportant.  Defendants are incorrect.

19       In arguing the disclosure of SUNE's agreements with underwriters was sufficiently complete,

20   defendants contend that the 15% Goldman Loan was too small to matter because it was for less than

21   $200 million and represented less than 1.5% of SUNE's total debt.  Mot. at 13-14.  But materiality is

22   not determined by a mathematical threshold.  *E.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S.

23   27, 43-44 (2011); *Litwin*, 634 F.3d at 717-18; *Silverstrand*, 707 F.3d at 105.  That SUNE disclosed a

24   *smaller* loan with another underwriter in the same section of the Prospectus debunks the notion that

25   the size of the loan rendered disclosure unnecessary as a matter of law.  *See* ¶129 (describing

26   $150 million loan with Deutsche-Bank); *see also* 17 C.F.R. §229.303(a)(5) (tabular disclosure of

27   contractual obligations "must include *all* of the obligations of the registrant").  Moreover, materiality

28   is established here not just by the size of the loan (which *is* material, as the Deutsche-Bank

1   disclosure confirms), but by the high interest rate that was paid (a clear confirmation of the

2   deterioration in SUNE's liquidity) and the reasons the loan was required (to cure an undisclosed

3   breach of a covenant in a loan made by another underwriter).  *See, e.g.*, *Litwin*, 634 F.3d at 718-20

4   (omissions found material even when quantitatively small).

5       Given that SUNE's business model was entirely dependent on access to low cost financing

6   (*e.g.*, ¶¶46-47), the materiality of premium financing from an investor standpoint is heightened

7   relative to other business models.  Here, the Complaint specifically alleges: "That SUNE needed to

8   borrow funds at a 15% rate was a tacit admission, or at a minimum a red flag, that the

9   representations about SUNE's financial strength, liquidity and capital resources . . . were false."

10  ¶70.[17]  Further, Cobalt specifically alleges that it (and other reasonable investors) would ***not*** have

11  purchased the securities sold in the Offering if they "had known that SUNE had recently borrowed

12  funds at an effective rate of 15% from one of the underwriters."  ¶¶83, 126.  These allegations are

13  sufficient to allege materiality at the pleadings stage.  *Matrixx*, 563 U.S. at 43-44; *Litwin*, 634 F.3d at

14  717-18.

15      Although defendants seek to challenge the allegation that SUNE paid an exorbitant interest

16  rate to Goldman, they relegate their arguments to a footnote in their brief, likely because they

17  recognize that their contentions contradict the pleadings and rely on facts outside of the Complaint,

18  rendering them an improper basis on which to grant dismissal.  *See* Mot. at 14 n.5; *see also*

19  *Corinthian Colls.*, 655 F.3d at 998 (facts outside pleadings may not be considered on motion to

20  dismiss); *see also Macdonald v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 151277, at *21 (N.D. Cal.

21  Nov. 2, 2015) ("'Many courts will disregard arguments raised exclusively in footnotes.'").  Contrary

22  to defendants' footnoted arguments, the Complaint pleads that the interest rate paid to Goldman was

23

24

---

25  [17]   *See also id*. (alleging that disclosing the 15% interest rate at the time the loan was structured in
26  July 2015 "would have immediately alerted investors" that SUNE and its yieldco, TerraForm Global,
    Inc., lacked the ability to meet forecast growth); ¶78 ("SUNE's inability to satisfy the call absent
27  borrowing funds at an extraordinary 15% interest rate would have caused investors to disbelieve
    defendants' statements about the company's liquidity, efficient use of capital and financial strength,
28  and to discredit defendants' bullish outlook for the business.").

1  outsize the LIBOR spreads on SUNE's other loans. ¶67. Defendants' arguments provide no basis to

2  reject this allegation.[18]

3       Defendants are also incorrect in asserting that investors had all "the relevant information"

4  needed to "reach reasoned conclusions" about underwriter conflicts or other risks of the Offering.

5  Mot. at 13:6-22. Not only did the omission of the Margin Loan Breach and 15% Goldman Loan

6  conceal conflicts of interest of the underwriters (who had already profited from SUNE's rapidly-

7  deteriorating liquidity and had an interest in assuring that the Offering was completed to prevent

8  further deterioration), it also rendered other portions of the Prospectus (*i.e.*, the discussion of

9  liquidity and capital resources, as described in ¶124) misleading by omission.

10      Defendants' arguments over the "Use of Proceeds" statements are also meritless. The

11  omission of the Margin Loan Breach and 15% Goldman Loan concealed SUNE's worsening

12  liquidity condition, including that, contrary to the representations in the Prospectus, the Company

13  did ***not*** have sufficient sources of liquidity to meet its anticipated cash flow needs over the ensuing

14  12 months. ¶¶61, 92-108, 124-125, 136-137. Thus, when the Prospectus said that the Offering

15  proceeds would be used to "fund[] working capital and growth initiatives," investors understood that

16  the Offering was designed to provide additional working capital to address needs that had not yet

17  arisen.[19]  ¶¶136-137. The Complaint alleges this was misleading because, in fact, the Offering

18  _____

19  [18]   It is defendants, not Cobalt, who are comparing apples to oranges in contending that the 15%
    Goldman Loan was obtained at below market rates. To begin with, the "evidence" they submit in

20  support of their argument (Ex. G) lacks foundation, as it is incomplete and fails to identify how the
    data was derived, or the nature and relevant terms of the loans to which it pertains. Even assuming

21  their data is relevant and reliable, the spread over LIBOR is only one component that determines the
    borrowing cost. Up-front fees, discount points, the term of the loan and other terms and conditions

22  will all factor into determining the true cost of the debt. Moreover, defendants' exhibit only
    provides the average LIBOR spread on a quarterly basis. It provides no reliable information

23  regarding borrowing costs on the date the 15% Goldman Loan closed, nor does it provide any basis
    for determining the rates on a one-year term loan (which would be lower than any longer-term loans

24  included in the data) or the up-front borrowing costs associated with the loans to which the data
    pertains. The Complaint here alleges that, taking these factors into account, the 15% Goldman Loan

25  resulted in a borrowing cost that equated to a 14% spread over LIBOR, which was significantly
    above prevailing market rates and also significantly above the 1.25% − 4.25% LIBOR spread of the

26  loans that ***were*** disclosed in the Prospectus. ¶67. Defendants' attempt to contradict this allegation
    with unauthenticated evidence of dubious relevance and uncertain provenance is improper, and

27  provides no ground for dismissal. *E.g.*, *Corinthian Colls.*, 655 F.3d at 998.

    [19]   This was, in fact, consistent with the message that SUNE and its representatives had presented at

28  investor conference calls during the same time period. ¶¶73-74.

1   proceeds were needed to meet existing liquidity requirements, rather than to provide flexibility to

2   take advantage of possible future opportunities.  *Id.*  Defendants' assertion that "funding working

3   capital" was not misleading because it could also mean addressing current needs rather than future

4   opportunities simply raises factual issues for discovery, as the Complaint alleges that reasonable

5   investors, including Cobalt, would not have interpreted the phrase in that manner given the other

6   statements in the Prospectus and the context in which the Offering was conducted.  ¶¶73-74, 136-

7   137; *see also* 17 C.F.R. §229.504 (Reg. S-K Use of Proceeds disclosure requirement).  Moreover,

8   defendants' argument ignores that even literally accurate statements can be misleading when

9   considered in context.  *E.g.*, *Omnicare*, 135 S. Ct. at 1327-28; *Facebook*, 986 F. Supp. 2d at 515;

10  *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000); *In re Sturm, Ruger & Co. Sec. Litig.*, 2011

11  U.S. Dist. LEXIS 11341, at *17 (D. Conn. Feb. 7, 2011).

12      **C.      All of the Alleged Misrepresentations and Omissions Are Actionable**

13          Defendants next challenge the actionability of various statements in the Complaint.  None of

14  these scatter-shot arguments support dismissal.

15          First, defendants attack false statements that are alleged in 11 paragraphs contained within

16  the section of the Complaint titled "Background to the Offering."  Mot. at 16-17 (Part B.1.); *see also*

17  Complaint at pg. 6.  While each of these statements are false, and help provide  relevant context and

18  background to the Offering (as the title of that section reflects), none of those statements are alleged

19  to have been made in violation of §§11 or 12(a)(2) of the Securities Act with respect to the Offering.

20  The actionable misrepresentations supporting Cobalt's claims are set forth in ¶¶121-137, in a section

21  of the Complaint titled "Untrue Statements of Material Fact in and Other Material Facts Omitted

22  from the SUNE Preferred Offering Materials."  *See* Complaint pg. 30.  As defendants' argument is

23  not directed at any of the misrepresentations alleged therein, it provides no ground for dismissal.

24          Next, defendants challenge various statements that they acknowledge are "within the

25  Offering Documents," including the statements incorporated by reference into the Prospectus from

26  SUNE's 2Q15 Report on Form 10-Q.  Mot. at 17-20 (Part B.2.).  Their arguments directed at the

27  misrepresentations alleged in ¶¶127, 129, 132 and 136 simply reiterate points made earlier in their

28  brief, and may be rejected for reasons earlier discussed here.  Their arguments directed at the

1    Prospectus' liquidity disclosures (¶124) and its description of SUNE's business (¶134) have, with a

2    few exceptions, been previously addressed here as well.  By failing to reveal the Margin Loan

3    Breach or 15% Goldman Loan, or to disclose SUNE's inability to complete the Vivint acquisition or

4    fund its operations over the next 12 months from existing sources of liquidity, defendants failed to

5    disclose material risks to SUNE's business that were required to be included in the Prospectus.

6          Defendants' contention that the statements in ¶124 contain opinions that are inactionable

7    under *Omnicare* is also incorrect.  As the Supreme Court has recognized, "whether an omission

8    makes an expression of opinion misleading ***always*** depends on context."  *Omnicare*, 135 S. Ct. at

9    1330.  Although defendants do not identify the specific statements they challenge on this basis, it

10   appears that their argument is directed at the assertion that "[w]e believe our liquidity will be

11   sufficient to support our operations for the next twelve months . . .," as none of the other statements

12   in that paragraph are cast in terms of "opinion" or "belief."  The Complaint satisfies *Omnicare* with

13   respect to this statement, because: (i) the omitted information is specifically identified (*e.g.*, ¶¶61,

14   76-78, 81, 121, 125); (ii) the omitted information was material (*supra* §II.B.2.b); and (iii) reasonable

15   investors would not have expected SUNE to opine that its liquidity would be sufficient for the next

16   12 months where it had already breached the loan covenants in one of its significant borrowing

17   agreements, had borrowed funds at a rate of 15% because it lacked the liquidity to address the breach

18   on its own, and was searching for additional liquidity needed to complete planned acquisitions (*e.g.*,

19   ¶¶61, 70, 78).  *See Omnicare*, 135 S. Ct. at 1333 (discussing pleading requirements).  Thus, claims

20   arising from this opinion should not be dismissed.

21         Defendants also contend that the statement in ¶124 about SUNE's ability to fund its working

22   capital requirements for the next 12 months is a forward-looking statement that is inactionable under

23   the "bespeaks caution" doctrine.  Again, defendants are mistaken.  Even the cases defendants rely on

24   recognize that to provide protection the warnings must be specific to the risk, and the mere

25   "'inclusion of *some* cautionary language is not enough to support a determination as a matter of law

26   that defendants' statements were not misleading.'"  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408

27   (9th Cir. 1996) (emphasis in original).  The Prospectus did not contain sufficient cautionary language

28   or risk disclosures to meet this standard.  As described above, the warnings defendants rely on were

1    conditional, and merely told investors that *if* significant adverse events occurred in the future, SUNE

2    might not be able to access the liquidity sources it was relying on to run its business beyond the next

3    12 months, or to do so "on favorable terms . . . when we need such funding."  But these adverse

4    events had ***already occurred*** at the time of the Offering and SUNE had been ***unable*** to address the

5    breach by obtaining financing on favorable terms.  Thus, the "warning" defendants rely on was no

6    warning at all.  *E.g.*, *Facebook*, 986 F. Supp. 2d at 511; *Prudential*, 930 F. Supp. at 72.  Dismissal of

7    the statements in ¶124 under the bespeaks caution doctrine would therefore be improper.  *Stac*, 89

8    F.3d at 1408 (dismissal based on the sufficiency of the warnings is proper only where "reasonable

9    minds could not disagree that the challenged statements were not misleading'" in light of the risk

10   warnings).

11           Finally, defendants assert that the misrepresentations alleged in ¶134 are inactionable

12   forward-looking puffery.  Defendants are wrong here too.  In the statement quoted in ¶134, SUNE

13   represented that during 2Q15 it had "continued execution of a strategic plan" that had been designed

14   "to address the most significant . . . risks which we currently face" and would permit SUNE to

15   continue developing its project pipeline and managing its working capital in a manner that

16   positioned it to continue dropping projects down to its yieldcos at economic rates of return, and

17   generating dividends for it and its investors.  This was not a general expression of optimism like the

18   statements at issue in *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010), on which

19   defendants rely.  Rather, these were specific and detailed representations, tied to and bolstered by

20   other information in the Prospectus, which purported to tell investors how SUNE's business was

21   ***currently*** performing and the risks it ***currently*** faced.  The statement told investors that SUNE's

22   business strategy was intact and on track, which was materially misleading in light of the statements

23   elsewhere in the Prospectus that assured investors that SUNE had the liquidity needed to carry out its

24   plans, and in light of the Prospectus' omission to disclose the Margin Loan Breach, 15% Goldman

25   Loan, liquidity problems and other risks to achieving those plans.  This statement was neither

26   forward-looking nor mere puffery, and defendants' motion to dismiss claims arising from it should

27   be denied.  *See, e.g.*, *DDI*, 2005 U.S. Dist. LEXIS 28216, at *53-*57 (rejecting assertion that

28

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA                                                    - 25 -

1    misrepresentations concerning current state of business not protected by "puffery" or protected as

2    forward-looking).

3        **D.    Defendants Are Statutory Sellers Under Section 12**

4           Plaintiffs adequately allege that SUNE, the Individual Defendants, and Hernandez qualify as

5    sellers under §12(a)(2).  Section 12 extends liability to "[a]ny person" who "offers or sells" the

6    subject security.  15 U.S.C. §77l(a)(2).  This "statutory seller" requirement, undefined in the statute,

7    for decades led courts to widely disparate interpretations, some requiring strict privity and others

8    extending liability to collateral participants, like lawyers or even friends offering gratuitous advice.[20]

9    In *Pinter*, the United States Supreme Court rejected both extremes, holding "seller" is "not limited to

10   persons who pass title," but includes all persons who "solicit" the sale of securities, "motivated at

11   least in part by a desire to serve his own financial interests or those of the securities owners."  486

12   U.S. at 643, 647.  Whether a defendants' conduct meets this standard necessarily turns on questions

13   of fact – *inter alia,* each defendant's subjective motivation – and thus is not properly resolved at the

14   pleading stage.  *See, e.g.*, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal.

15   2009) ("Whether or not defendants actually solicited plaintiffs' sales is a factual question which

16   should generally be left to the jury . . . ."); *In re Portal Software, Inc. Sec. Litig*, 2006 U.S. Dist.

17   LEXIS 61589, at *11-*12 (N.D. Cal. Aug. 17, 2006) (the question of "'whether [a defendant] is a

18   seller under section 12 is a question of fact, not properly decided" at pleading stage); *Nieman*, 2013

19   U.S. Dist. LEXIS 110693, at *23 ("whether a person is a statutory seller under §12(a)(2) is a

20   question of fact not appropriately decided on a motion to dismiss").  Under any interpretation of

21   these requirements, plaintiffs' allegations more than suffice to plead a §12(a)(2) claim.[21]

22

23   [20]  *See Pinter v. Dahl*, 486 U.S. 622, 642 (1988) ("[T]he Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue. The courts, on their part, have not defined the term uniformly.").

24

25   [21]  Courts reject defendants' purported "direct contact" requirement.  *Compare* Mot. at 21, *with Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (rejecting direct communication requirement); *In re OPUS360 Corp. Sec. Litig*., 2002 U.S. Dist. LEXIS 18558 (S.D.N.Y. Oct. 2, 2002); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) ("Since *Capri*, it has become well settled . . . that the seller need not have 'personal' contact with the purchaser . . . to be held liable under §12(a)(2).") (collecting cases).  In any event, the Complaint alleges the Individual Defendants and Hernandez directly solicited plaintiffs' purchases.  *See* ¶¶25, 34, 64, 71-75, 79-83, 113, 116, 141-42.

1.      **The Moving Defendants Are All Statutory Sellers**

As many courts have recognized, by preparing and signing offering documents, officers, directors, and the issuing company all "solicit" investor purchases and are thus liable as sellers under §12.[22] These decisions make sense.  "'To one who studies corporate filings and news releases before purchasing . . . on an impersonal and anonymous market, the corporation, its officers and directors, and other promoters of the stock appear to be the true "sellers."  Thus, it is reasonable to infer that Congress intended Section 12[] to [apply to] [such] persons . . . .'"  *Kensington*, 1999 U.S. Dist. LEXIS 385, at *14.  Accordingly, here, the Individual Defendants (and SUNE) qualify as sellers because each is an officer or director of SUNE and prepared and signed the Offering Documents issued to investors.  *Id.*; *Proxima*, 1994 U.S. Dist. LEXIS 21443, at *14-*15 ("[S]ince the Prospectus itself is a solicitation document, those individual defendants who signed the Registration Statement (all the directors) effectively were soliciting the public to purchase Proxima stock."); *Nat'l Golf*, 2003 WL 23018761, at *3 ("allegations that an issuer signed a registration statement is sufficient to allege active solicitation . . . because the registration/prospectus is a solicitation document, those who sign registration statement effectively solicit purchase of securities").  The fact that the Offering was a "firm commitment offering" does not change this result.[23]  *E.g.*, *In re Stratosphere Corp. Sec.*

---

[22]  *See, e.g.*, *Kensington Capital Mgmt. v. Oakley, Inc.*, 1999 U.S. Dist. LEXIS 385, at *14 (C.D. Cal. Jan. 14, 1999) (signature alone sufficient); *In re Proxima Corp. Sec. Litig.*, 1994 U.S. Dist. LEXIS 21443, at *13-*15 (S.D. Cal. May 4, 1994) (same); *In re Nat'l Golf Props., Inc. Sec. Litig.*, 2003 WL 23018761, at *8-*11 (C.D. Cal. Mar. 19, 2003) (same); *Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009) (same); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005) (same); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (same); *In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, at *11 (S.D.N.Y. Nov. 19, 1999) (same); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) (same); *Degulis v. LXR Biotechnology*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (same).

[23]  Although SUNE is not a party to the Motion (because the case is stayed as to it), defendants argue that, on the same basis, SUNE is also not liable under §12(a)(2).  *See* Mot. at 20:18, 21:14. Defendants are incorrect.  SEC Rule 159A establishes that, as the issuer, SUNE is a statutory seller as a matter of law.  17 C.F.R. §230.159A(a) ("regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold . . . and the issuer shall be considered to offer or sell the securities"); *e.g.*, *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012) ("SEC Rule 159A provides that an issuer of securities is considered a statutory seller for purposes of §12(a)(2) regardless of the form of underwriting . . . by 'offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed,' ***the issuer 'can be viewed as soliciting purchases of the issuer's registered securities***.'"); *In re Am. Realty Capital Props., Inc. Litig.*, 2015 U.S. Dist. LEXIS

1    *Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998) ("A firm commitment offering does not mean that

2    only the underwriters selling the security may be sued, and that those involved in preparing the

3    registration statement cannot be liable."); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d

4    1052, 1073 (N.D. Cal. 2010) (same).

5           Moreover, even those courts that find signing offering documents alone insufficient (*cf.* Mot.

6    at 21) recognize that such allegations suffice when coupled with direct involvement in the offering

7    and promotion thereof.  *See, e.g.*, *OPUS360*, 2002 U.S. Dist. LEXIS 18558, at *31 ("In the context

8    of a firm commitment underwriting, an allegation that the defendant participated in the preparation

9    of the registration statement and in road shows promoting the IPO, while motivated by the prospect

10   for financial gain, is sufficient to constitute the active solicitation of securities."); *In re OSG Sec.*

11   *Litig.*, 971 F. Supp. 2d 387, 403 (S.D.N.Y. 2013) (preparation of prospectus sufficient); *Vivendi*, 381

12   F. Supp. 2d at 186-87 (preparation of prospectus and involvement with road shows sufficient).

13          Here, in addition to preparing and signing the Offering Documents, the Individual

14   Defendants (on behalf of themselves and SUNE), actively solicited the investing public to purchase

15   securities, hired, assisted, and indemnified the underwriters, planned and contributed to Offering

16   Documents, participated in drafting sessions with the underwriters, and otherwise touted SUNE and

17   the Offering to potential SUNE investors, all motivated by their own and SUNE's financial interests.

18   *See* ¶¶25, 34, 64, 71-75, 79-83, 113, 116, 141-142.

19          So too, Hernandez, for his own and SUNE's benefit, directly solicited the Offering to

20   investors.  *See id.*; *see also* ¶64 (July 27, 2015 conference call with SUNE investors touting, *inter*

21   *alia*, "ample liquidity and a conservative capital structure," and "full flexibility to deploy this

22   liquidity to fund the pending transactions and the overall growth of our business"); ¶72 (August 6,

23   2015 conference call touting, *inter alia*, SUNE's "very strong liquidity position and . . . [that] cost of

24   funding remains low.").  Hernandez's focus on whether he "made" actionable misstatements during

25   conference calls is beside the point.  Hernandez Mot. at 5-8.  His statements to investors during

26   conference calls constitute solicitation, thus establishing him as a statutory seller liable under

27   _____
     151966, at *18 (S.D.N.Y. Nov. 6, 2015) ("An issuer is a statutory seller for the purposes of Section

28   12(a)(2) regardless of the form of underwriting.") (citing Rule 159A).

§12(a)(2).  Whether those solicitations were misleading is irrelevant; §12 turns on misrepresentation in the Prospectus, not misrepresentation in the solicitation of that prospectus.  Nor does §12 require reliance.  *Compare* Hernandez Mot. at 7 (contesting lack of a "causal connection between the alleged misrepresentations and plaintiffs' purchase[s]"), *with Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 965 (9th Cir. 1990) ("reliance is not an element of a section 12(2) claim"); *see also Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970) (rejecting same "theory of 'causation' [a]s an impermissible attempt to introduce reliance upon the misrepresentations and omissions as a necessary element of Section 12(2)"); *Currie v. Cayman Res. Corp*., 835 F.2d 780 (11th Cir. 1988) (same); *Demarco v. Edens*, 390 F.2d 836, 841 (2d Cir. 1968) (same).

The Complaint thus plausibly alleges the Individual Defendants and Hernandez are sellers within the meaning of §12(a)(2), and defendants' motion to dismiss should be denied.

### 2.   The Underwriter Defendants Are Also Liable Under §12(a)(2)

Though the Underwriter Defendants filed a one-paragraph "joinder" in the Individual Defendants' Motion, nothing in that Motion argues that the Underwriter Defendants are not liable under §12(a)(2).  In fact, the Motion argues just the opposite.  *See* Mot. at 20 (the "securities were sold [] by the members of the underwriting syndicate").  Thus by joining the Motion, the Underwriter Defendants concede their status as sellers under §12.  Even if they hadn't, Cobalt specifically allege the Underwriter Defendants both sold and solicited purchases in the Offering, motivated by their own and SUNE's financial interests.  ¶¶26-35.  Thus, a claim of §12(a)(2) liability has been pled against them as well.  *See, e.g.*, *In re Am. Bank Note Holographics Sec. Litig*., 93 F. Supp. 2d 424, 439 (S.D.N.Y. 2000) (underwriters held sellers in firm commitment offering).

### E.   Defendants Provide No Reason to Dismiss Claims Under Section 15

Although defendants ask the Court to dismiss this action in its entirety, none of their Motions make any argument in support of dismissing Cobalt's claims under §15 of the Securities Act, 15 U.S.C. §77o; *see also* ¶¶149-153.  Accordingly, those claims may not be dismissed.  *DDI*, 2005 U.S. Dist. LEXIS 28216, at *69 n.19 (upholding §15 claim where defendants did not provide specific argument in opening brief); *see also* Fed. R. Civ. P. 12(g)(2) (serial motions to dismiss not permitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.    CONCLUSION

For the reasons set forth above the motions to dismiss submitted by the Individual Defendants and Hernandez, and the Underwriter Defendants joinder therein, should all be denied in their entirety.  In the event that the Court grants the Motions in any respect, Cobalt respectfully requests leave to amend to add allegations found necessary by the Court to uphold their claims.

DATED:  July 1, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN
DAVID W. HALL


                    s/Dennis J. Herman
                  DENNIS J. HERMAN

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
JAMES I. JACONETTE
SCOTT H. SAHAM
JENNIFER N. CARINGAL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

COBALT'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
JOINDERS THEREIN - 3:16-cv-02263-WHA

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on July 1, 2016, I authorized the electronic filing of the foregoing with

3    the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4    e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5    caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6    CM/ECF participants indicated on the attached Manual Notice List.

7          I certify under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.  Executed on July 1, 2016.

9                                              s/Dennis J. Herman
                                            DENNIS J. HERMAN
10
                                            ROBBINS GELLER RUDMAN
11                                              & DOWD LLP
                                            Post Montgomery Center
12                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
13                                            Telephone:  415/288-4545
                                            415/288-4534 (fax)
14                                            E-mail:dennish@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1158379_1

## Mailing Information for a Case 3:16-cv-02263-WHA Cobalt Partners, LP, et al v. SunEdison, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jaime Allyson Bartlett**
  jbartlett@sidley.com,sfefilingnotice@sidley.com,tberninzoni@sidley.com,dgiusti@sidley.com

- **Norman J. Blears**
  nblears@sidley.com,tscuffil@sidley.com,sfefilingnotice@sidley.com,kmay@sidley.com,rtallungan@sidley.com

- **Michael G. Bongiorno**
  michael.bongiorno@wilmerhale.com

- **Daniel H. Bookin**
  dbookin@omm.com,mgill@omm.com,LitigationCalendar@omm.com,rgonzalez@omm.com,kbetcher@omm.com

- **Sara B. Brody**
  sbrody@sidley.com,marvely.macdonald@sidley.com,ddelarocha@sidley.com,sfdocket@sidley.com

- **Jennifer N. Caringal**
  JCaringal@rgrdlaw.com

- **Adam S. Hakki**
  ahakki@shearman.com

- **David William Hall**
  dhall@rgrdlaw.com

- **Sarah Alison Hemmendinger**
  shemmendinger@sidley.com,sfefilingnotice@sidley.com,sfdocket@sidley.com,laefilingnotice@sidley.com,kcochran@sidley.com

- **Dennis J. Herman**
  dennish@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **James Ian Jaconette**
  jamesj@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel Craig Lewis**
  daniel.lewis@shearman.com

- **Jie Li**
  lisa.li@wilmerhale.com

- **Timothy J. Perla**
  timothy.perla@wilmerhale.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Patrick David Robbins**
  probbins@shearman.com,rcheatham@shearman.com

- **Scott H. Saham**
  scotts@rgrdlaw.com

- **Robin Eve Wechkin**
  rwechkin@sidley.com,sfefilingnotice@sidley.com,sfdocket@sidley.com,enorwood@sidley.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Terraform Global, Inc.**
,