1    Sara B. Brody, SBN 130222
     sbrody@sidley.com
2    Jaime A. Bartlett, SBN 251825
     jbartlett@sidley.com
3    Sarah A. Hemmendinger, SBN 298659
     shemmendinger@sidley.com
4    SIDLEY AUSTIN LLP
     555 California Street, Suite 2000
5    San Francisco, California 94104
     Telephone: (415) 772-1200
6    Facsimile: (415) 772-7400

7    Norman J. Blears, SBN 95600
     nblears@sidley.com
8    SIDLEY AUSTIN LLP
     1001 Page Mill Road, Building 1
9    Palo Alto, California 94304
     Telephone: (650) 565-7000
10   Facsimile: (650) 565-7100

11   Robin Wechkin (admitted *pro hac vice*)
     rwechkin@sidley.com
12   SIDLEY AUSTIN LLP
     701 Fifth Avenue, Suite 4200
13   Seattle, Washington 98104
     Telephone: (206) 262-7680

14
     Attorneys for SunEdison, Inc., Ahmad Chatila,
15   Brian Wuebbels, Martin Truong,
     Emmanuel Hernandez, Antonio R. Alvarez,
16   Clayton Daley, Jr., Georganne Proctor,
     Steven Tesoriere, James B. Williams, Randy H. Zwirn
17
     [Additional Counsel and Representations Listed on Signature Page]
18
                          **UNITED STATES DISTRICT COURT**
19
                        **NORTHERN DISTRICT OF CALIFORNIA**
20
                            **SAN FRANCISCO DIVISION**
21
     COBALT PARTNERS, LP, et al.,              Case No. 3:16-cv-02263-WHA
22
                          Plaintiffs,           **INDIVIDUAL DEFENDANTS' REPLY IN**
23                                              **SUPPORT OF MOTION TO DISMISS**
                                                **PLAINTIFFS' COMPLAINT**
24           vs.
                                                Honorable William Alsup
25   SUNEDISON, INC., et al.,
                                                Date:      August 18, 2016
26                        Defendants.           Time:      8:00 a.m.
                                                Courtroom: Courtroom 8, 19th Floor
27

28

# **TABLE OF CONTENTS**

**Page**

I.          INTRODUCTION .................................................................................................. 1

II.        DISCUSSION ........................................................................................................ 2

        A.     An Issuer's Duty To Update Previously Released Financial Information Is Narrowly Circumscribed.................................................................................. 2

        B.     SunEdison's Disclosures As Of August 6, 2015 Showed A Company Struggling With Debt And Deeply Dependent On External Sources Of Capital................................................................................................................ 4

        C.     SunEdison Had No Duty To Update The August 6, 2015 Disclosures To Reflect The August 7, 2015 Margin Call....................................................... 6

        D.     SunEdison Had No Duty To Update The August 6, 2015 Disclosures To Reflect The August 11 Loan. ................................................................... 9

        E.     Plaintiffs Plead No Facts Showing That The Affirmative Statements In The Offering Materials Were False or Misleading. ................................... 11

        F.     Plaintiffs Plead No Facts Showing That The Individual Defendants Can Be Liable As Sellers Under Section 12(a)(2). ........................................... 14

III.       CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Ariad Pharms., Inc. Sec. Litig.*,
  98 F. Supp. 3d 147 (D. Mass. 2015) ...................................................................... 3

*Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................... 9

*In re The Children's Place Sec. Litig.*,
  1998 WL 35167284 (D.N.J. 1998) ......................................................................... 9

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .................................................... 3, 9

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
  2012 WL 1322884 (C.D. Cal. Apr. 16, 2012) ..................................................... 15

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) ................................................................................. 15

*Dekalb Cty. Emps. Ret. Sys. v. Controladora Vuela Compania De Aviacion, S.A.B.*,
  2016 WL 3685089 (S.D.N.Y. July 6, 2016) ........................................................ 10

*In re Facebook, Inc. IPO Securities and Derivative Litigation*,
  986 F. Supp. 2d 487 (S.D.N.Y. Dec. 12, 2013) .................................................... 3

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010) ................................................................... 3

*Fouad v. Isilon Sys.*,
  2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ................................................. 15

*Gavish v. Revlon, Inc.*,
  2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ..................................................... 10

*Litwin v. Blackstone Grp.*,
  634 F.3d 706 (2d Cir. 2011) ........................................................................... 10, 11

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011) ....................................................... 15

*In re N2K, Inc. Sec. Litig.*,
  82 F. Supp. 2d 204 (S.D.N.Y. 2000) ...................................................................... 3

*In re Newell Rubbermaid Inc. Sec. Litig.*,
  2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) ...................................................... 10

*In re OSG Sec. Litig.*,
   971 F. Supp. 2d 387 (S.D.N.Y. 2013) ................................................................. 15

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997) ............................................................................... 10

*Pearlstein v. Blackberry, Ltd.*,
   2015 WL 1137519 (S.D.N.Y. Mar. 13, 2015) ......................................................... 9

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ............................................................................... 15

*Schuh v. HCA Holdings, Inc.*,
   947 F. Supp. 2d 882 (M.D. Tenn. 2013) ................................................................. 9

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ...................................................................... 2, 3, 9, 15

*Silverstrand Inv. v. AMAG Pharm., Inc.*,
   707 F.3d 95 (1st Cir. 2013) ................................................................................... 9

*Stadnick v. Vivint Solar, Inc.*,
   2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015) ......................................................... 3

*In re Stratosphere Corp. Sec. Litig.*,
   F. Supp. 2d 1096 (D. Nev. 1998) ......................................................................... 15

*In re Turkcell Iletisim Hismetler, A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) ....................................................................... 3

**STATUTES & RULES**

15 U.S.C. § 77k (Section 11 of the Securities Act) ......................................... *passim*

15 U.S.C. § 77l(a)(2) (Section 12(a)(2) of the Securities Act) ......................... *passim*

17 C.F.R. §229.303 (Item 303) ......................................................................... 8, 9

17 C.F.R. § 229.508(a) (Item 508(a)) ................................................................. 13

17 C.F.R. § 229.512 (Rule 512) ....................................................................... 4, 9

17 C.F.R. § 230.408 (Rule 408) ......................................................................... 3

Fed. R. Civ. P. 12(b)(6) ................................................................................... 6

**OTHER AUTHORITIES**

SEC Interpretive Release Nos. 33-8350, 34-38960, FR-72 (2003) ......................... 8

## I.     INTRODUCTION

Although Plaintiffs' opposition to Defendants' motion to dismiss is long and densely argued, it ultimately simplifies the issues before the Court.  Plaintiffs focus overwhelmingly on two relatively minor transactions alleged to have occurred between the time SunEdison issued its last reported quarterly financial statements—on August 6, 2015—and the time of SunEdison's preferred stock offering—August 18, 2015.  The transactions are (1) an alleged margin call on August 7, 2015, in response to which SunEdison purportedly posted $152 million in cash collateral, and (2) a term loan agreement SunEdison entered into on August 11, 2015, in which the Company borrowed $169 million at what Plaintiffs call an "effective" interest rate of 15%.

These two loan transactions took place against a background of escalating—and disclosed—indebtedness, in which SunEdison's debt burden had grown from $7 billion to close to $11 billion.  SunEdison had also recently announced a business plan that involved up to $5 billion of anticipated new financing.  Meanwhile, the Company was operating at a loss and consuming its current assets—which was also disclosed.

Plaintiffs contend that because SunEdison did not describe the events of August 7 and August 11 in its offering materials, the Company misrepresented its financial condition.  But Plaintiffs do not seriously question the accuracy of SunEdison's financial disclosures as of August 6, 2015.  Their complaint instead is that the financial information released on that date had become stale—indeed, misleadingly so—by August 18, 2015, the date of the offering.  According to Plaintiffs, SunEdison had a duty to update the previously released financial information with new information related to the August 7 margin call and the August 11 Loan.

The question on this motion can therefore be framed straightforwardly:  Did SunEdison have a duty to update its August 6, 2015 financial disclosures—which were incorporated by reference into the offering materials—in order to reflect the events of August 7 and August 11, 2015?  The answer, as we discuss below, is *no*, based on the very authorities Plaintiffs cite.

The issue here is a common one.  Nearly every public securities offering occurs while a financial reporting period is in progress.  Issuers are required to disclose financial results for the *prior* period, but this leaves open the question of whether, and to what extent, they are also required

to provide information about the *ongoing* quarter.  Both the courts and the SEC have answered that question narrowly.  Issuers are required to provide information about a financial reporting period still in progress only when that information reflects an "extreme departure" or a "fundamental change" from results that would have been expected based on data from the prior period.

The facts Plaintiffs have pled fall short of that standard.  Those facts do not show that the August 7 margin call or August 11 Loan reflected an "extreme" or "fundamental" deviance from SunEdison's financial condition as described on August 6.  On the contrary:  The events of August 7 and August 11 were entirely consistent with it.  Plaintiffs therefore fail to establish that SunEdison had a duty to update the August 6 filing in the August 18 Prospectus, and similarly fail to plead facts showing that the challenged  statements were misleading on this or any other basis.

## II.    DISCUSSION

### A.    An Issuer's Duty To Update Previously Released Financial Information Is Narrowly Circumscribed.

In arguing that SunEdison had a duty to update the financial information reported on August 6, 2015, Plaintiffs cite, among other authorities, the First Circuit's seminal decision in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996).  Pls' Consolidated Opp. to Defs' Mot. to Dismiss (Opp.) at 18.  In the context of Securities Act claims, the *Shaw* court rejected both a proposed bright-line rule that would have relieved issuers of the duty to report *any* financial information related to a quarter in progress and a rule requiring issuers to report such information whenever it appears that the current quarter may yield disappointing results.  82 F.3d at 1210.  The court explained why the latter option was unacceptable:

> Reasonable investors understand that businesses fluctuate, and that past success is not a guarantee of more of the same.  There is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated.  The market takes this risk of variability into account in evaluating the company's prospects based on the available facts concerning the issuer's past historical performance, its current financial condition, present trends and future uncertainties.

*Id.*  The court then crafted a standard that struck a balance—that ensured both that investors would be materially informed and that issuers would not be forced into unworkable or premature reporting obligations regarding the quarter in progress.  The court held that an issuer has a duty to update the previous period's financial information in offering documents only when "the issuer is in

possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an *extreme departure* from the range of results which could be anticipated based on currently available information." *Id.* (emphasis added). The court went on to stress that, under this standard, claims based on an alleged breach of the duty to update could in many circumstances be disposed of as a matter of law. *Id.* at 1210-11 (citing authorities).

Courts have continued to apply *Shaw*'s "extreme departure" standard in the 20 years since the case was decided. The Southern District of New York has repeatedly dismissed claims under this standard, most recently in *Stadnick v. Vivint Solar, Inc*., 2015 WL 8492757, at *11-13 (S.D.N.Y. Dec. 10, 2015). In another recent decision, the same court recognized the strong judicial and regulatory policy against premature disclosure of events transpiring in the weeks or months leading up to an offering. *In re Coty Inc. Sec. Litig*., 2016 WL 1271065, at *6-8 (S.D.N.Y. Mar. 29, 2016). The court thus noted that "'the case law [in Section 11 cases] reflects that courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress.'" *Id. at* *6 (quoting *In re Focus Media Holding Ltd. Litig*., 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010)). The court further noted that both the SEC and the courts "'recognize[ ] how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be.'" *Id.* (quoting *In re Turkcell Iletisim Hismetler, A.S. Sec. Litig*., 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)). Other decisions are in accord. *See, e.g., In re Ariad Pharms., Inc. Sec. Litig*., 98 F. Supp. 3d 147, 172-73 (D. Mass. 2015) (rejecting claim that company was required to report interim developments where plaintiffs could not satisfy the "extreme departure" standard); *In re N2K, Inc. Sec. Litig*., 82 F. Supp. 2d 204, 208 (S.D.N.Y. 2000) (same).[1]

The SEC's position is much the same. Plaintiffs cite Item 512 of Regulation S-K, which

---

[1] Plaintiffs rely heavily on *In re Facebook, Inc. IPO Securities and Derivative Litigation*, which at one point appears to suggest that, under SEC Rule 408, issuers are required to disclose interim financial information whenever it is material. 986 F. Supp. 2d 487, 522 (S.D.N.Y. Dec. 12, 2013). But this would be inconsistent both with *Shaw*'s "extreme departure" standard and with the Southern District of New York decisions, both pre- and post-*Facebook*, that apply it. It is also unsupported by Rule 408 itself, which requires disclosure of material information only when its omission would render an affirmative statement *misleading*. 17 C.F.R. § 230.408. Rule 408 thus merely incorporates into the rules governing offering documents the standard already applicable to Securities Act defendants under Sections 11 and 12(a)(2). It does not impose a general duty to disclose all material information, let alone information relating to a quarter still in progress.

requires issuers to update previously reported information only when events post-dating the previous filing represent a "*fundamental change* in the information set forth in the registration statement." 17 C.F.R. § 229.512(a)(1)(ii) (emphasis added).  The "fundamental change" standard, like the "extreme departure" standard, ensures that investors are informed without being overwhelmed by interim data—and that issuers are not saddled with unworkable disclosure duties.

**B.** **SunEdison's Disclosures As Of August 6, 2015 Showed A Company Struggling With Debt And Deeply Dependent On External Sources Of Capital.**

To determine whether SunEdison had a duty to report the events of August 7 and August 11, 2015, the obvious starting point is the August 6, 2015 filing.  The question is whether the later events reflect an "extreme departure" from the Company's financial condition as reported in that document.

The August 6, 2015 filing included SunEdison's financial statements for the first six months of 2015.  Ex. C at 5-8 (financial statements); *id.* at 9-51 (notes to financial statements); *id.* at 52-66 (Management's Discussion of Financial Condition and Results of Operation, or MD&A, which further elaborates on the financial statements).[2]  As discussed in the opening brief, SunEdison's financial statements disclosed the pertinent facts about the Company's liquidity as of the time of the filing.  Individual Defts' Mot. to Dismiss (Mot.) at 9-10.

In response, Plaintiffs complain that the Individual Defendants have not specified the *way* in which SunEdison's financial statements reflected its liquidity position.  Opp. at 6.  As sophisticated investors, Plaintiffs are presumably adept at analyzing financial statements.  Reading the financial statements incorporated into the offering materials, investors would have learned that SunEdison, for all of its future prospects, was operating at a loss, had borrowed significant amounts from a variety of sources, and depended on additional infusions of capital.  Among other things:

- SunEdison's balance sheet showed current liabilities in excess of current assets: $3.856 billion in current liabilities as opposed to $3.604 billion in current assets.  Ex. C at 6.  Plaintiffs contend that, at the time of the offering, "SUNE's financial condition appeared to be strong, with billions of dollars in liquidity on its balance sheet."  Opp. at 1.  But investors must plainly look at more than one line item on a balance sheet.  SunEdison's "billions of dollars" of assets had to be evaluated in the context of still more billions of dollars in current liabilities.

---

[2] "Ex. _" citations in this brief refer to the exhibits to the Request for Judicial Notice filed by the Individual Defendants on May 20, 2016.

- Management's discussion of liquidity and capital resources confirmed that the Company ended Q2 2015 with a "working capital deficit." *Id.* at 60.

- SunEdison's cash flow statement showed the Company consuming close to $1 billion over a six-month period in operating activities alone. *Id.* at 7. When construction expenditures are added in, the number rises to close to $2 billion. *Id.* And when acquisitions are added, the figure is over $4.5 billion. *Id.*

- SunEdison needed additional funding to finance its operations. Current assets were reported at $3.6 billion as of the end of Q2 2015, of which $700 million was committed for construction projects and not available to meet other expenses. This leaves $2.9 billion in assets to finance SunEdison's needs—which, even without the acquisitions the Company had disclosed, amounted to nearly $2 billion for a six-month period. *Id.* at 6-8. At the most basic level, SunEdison's business plainly depended on extensive additional financing from outside sources.

- SunEdison's cash flow statement confirmed that the Company depended heavily on external financing—$5 billion over the six-month period ended June 30, 2015. *Id.* at 8.

- SunEdison confirmed this in the MD&A section devoted to liquidity and capital resources. There, the Company outlined a plan to expand its generation capacity through acquisitions and new projects, and acknowledged that it would need up to an *additional* $5 billion to finance its business plan. *Id.* at 61. The Company further noted that no assurance could be made that such financing would be available, or available on acceptable terms. *Id.*

- The "Sources and Uses" table in the MD&A similarly showed SunEdison using capital more quickly than it was generating it—save, again, for external financing, including securities offerings. *Id.* at 62. Meanwhile, debt was rising steeply—from $7 billion over the previous six months to $10.7 billion in the period ended June 30, 2015.

Each of these data points contributed to the picture of a company that was running at a loss and in need of additional financing. If, as Plaintiffs claim, SunEdison was facing a liquidity crisis on August 7-11, then this was already apparent in the Company's August 6 filing, which disclosed working capital deficits, a high cash burn rate, and the planned need for additional borrowing.

It bears repeating that Plaintiffs do not seriously dispute the accuracy of SunEdison's financial statements as of August 6, 2015, when the Form 10-Q was filed. Mot. at 9. Plaintiffs note that months after they made their investment, SunEdison's CEO said that the Company's balance sheet was "hard to read"; they also observe that SunEdison did not timely file financial statements for fiscal 2015 (due in Q1 2016) in light of an internal investigation ongoing at that time. Opp. at 7. But financial statements are not misleading or inaccurate simply because they may be "hard to read." And SunEdison's Q2 2015 financial statements have never been restated, in connection with the 2016 investigation or otherwise. The critical question, therefore, remains whether the events of August 7-11, 2015—the only omissions Plaintiffs specify—represented an extreme departure from

1  SunEdison's financial condition, as portrayed in financial statements that were accurate when they

2  were filed on August 6, 2015.  Opp. at 7 ("Omitting to disclose the Margin Loan Breach and 15%

3  Goldman Loan rendered . . . SUNE's financial statements . . . misleading").[3]

4  **C.  SunEdison Had No Duty To Update The August 6, 2015 Disclosures To Reflect The August 7, 2015 Margin Call.**

5  As discussed in the opening brief, SunEdison disclosed the pertinent terms of the Margin

6  Loan in its quarterly filings.  Mot. at 6.  Among other things, SunEdison told investors (1) that the

7  $410 million loan was secured by TERP stock, (2) that the Company was required to maintain a 2:1

8  value to loan ratio, and (3) that if the value of the TERP stock fell below that level, *i.e.*, $820

9  million, the Company would be required to post cash collateral or repay the loan in part or whole.

10  *Id.*  In other filings, SunEdison provided still more specific information, including the number of

11  TERP shares securing the loan—32.2 million.  *Id.* at 8.

12  Plaintiffs cannot dispute that all of this was disclosed.  Nor can Plaintiffs dispute that the

13  trading price of TERP stock was a matter of public record.  It is these publicly disclosed facts, as

14  previously discussed, that are the basis of Plaintiffs' current contention that a margin call was made

15  on August 7, 2015.  *Id.*[4]  Given these disclosures, the margin call did not reflect an "extreme

16  departure" from SunEdison's financial condition as portrayed in the financial statements filed

17  August 6, 2015.  Indeed, the occurrence of that event could be—and in Plaintiffs' case has been—

18  derived from the same facts set forth in that and previous filings.[5]

19

20  [3] In a footnote, Plaintiffs argue that SunEdison's Q2 2015 financial statements were inaccurate insofar as the Margin Loan was classified as non-recourse, whereas in the Company's Q3 2015 financial statements, the debt was classified as recourse.  Opp. at 6 n.4.  Plaintiffs go on to say that this raises a factual issue outside the reach of a Rule 12(b)(6) motion.  *Id.*  But Plaintiffs have the burden of pleading facts plausibly supporting their claim that the challenged classification of the Margin Loan in the Q2 2015 financial statements was *false*.  Plaintiffs do not meet that burden simply by noting that the classification in Q3 2015 was *different*—particularly given SunEdison's disclosure that the Margin Loan was *amended* between the time the Company issued its Q2 financial statements and the time it issued its Q3 financial statements.  Ex. D at 28.

24  [4] Although Plaintiffs stop short of stating definitively that a margin call was made on that date, we assume hereafter, for ease of exposition and in light of the standard on a pleading motion, that a margin call indeed occurred on August 7, 2015.  Com. ¶ 76 & n.2.

26  [5] Plaintiffs say that their claim that a margin call occurred on August 7, 2015 is based not only on the facts in the public realm at that time but also on the fact—which they learned only later—that SunEdison entered into the August 11 Loan agreement four days afterwards.  Opp. at 5.  Plaintiffs surmise that this corresponds to an alleged two-day "cure" period in the Margin Loan agreement, and that therefore the August 11 Loan may have been connected to the margin call.  *Id.*  But

6

1    Plaintiffs nevertheless contend that SunEdison was obligated to disclose that a margin call

2    was made on August 7, rather than simply describing the contractual terms that triggered the call.

3    If Plaintiffs had known that a margin call had occurred, they say, they would have concluded that

4    the Company was facing a liquidity crisis. *E.g.*, Opp. at 2.  But investors knew from the August 6

5    financial statements that SunEdison was operating at a loss, that it had a working capital deficit, that

6    it was heavily indebted and dependent on new infusions of capital.  They also knew that the Margin

7    Loan was secured by TERP stock—the price of which was declining rapidly.  The fact that the

8    margin call occurred on a particular date does not reflect an extreme departure from SunEdison's

9    financial condition as set forth in the August 6 filing.  Nor does it reflect anything particular about

10   liquidity.  According to Plaintiffs themselves, the margin call was triggered not by a decrease in

11   liquidity *per se* but rather by the decrease in TERP's stock price.

12       Plaintiffs next say that SunEdison's *response* to the margin call—using cash rather than

13   posting additional TERP stock as collateral—would have given them additional insight into the

14   Company's dire liquidity situation.  According to Plaintiffs, "based on the description of the loan

15   covenants provided [in the offering materials] . . . investors expected that, if a breach occurred,

16   SUNE would cure it simply by posting more TERP shares as collateral."  Opp. at 5.  But this too is

17   simply untrue.  In describing the terms of the Margin Loan in its Q2 2015 financial statements,

18   SunEdison stated very clearly that a margin call would need to be satisfied by repayment or by cash

19   collateral—not by additional stock.  Ex. C at 25.[6]

20   Plaintiffs acknowledge that they are simply speculating, based on the timing and the amount of the
     August 11 Loan, that any such connection existed.  Com. ¶ 78.  In the same vein, Plaintiffs allege
21   that various challenged statements were misleading only "*[t]o the extent*" that the proceeds of the
     August 11 Loan were used to respond to the August 7 margin call.  *Id.*  Plaintiffs, in other words,
22   cannot point to any *facts actually related* to the Margin Loan that were concealed at the time of
     their purchases and revealed later.  Instead, in circular fashion, Plaintiffs point only to their own
23   litigation hypothesis that there was a connection between the Margin Loan and the August 11 Loan.

24   [6] Plaintiffs cite a UBS analyst who "speculated" on August 25, 2015 that a margin call had been
     made earlier in the month, and who "assumed," purportedly based on SunEdison's disclosures, that
25   the call had been satisfied with an additional pledge of TERP shares.  Opp. at 5; Com. ¶ 84.  But
     any such assumption would have been *contrary* to SunEdison's disclosures; again, the Company
26   explained to investors that a margin call would need to be satisfied with cash, not stock.  Ex. C at
     25.  The analyst report on which Plaintiffs purport to rely was inaccurate on its face in other ways
27   as well.  The analyst stated that a margin call would be triggered if the collateral securing the loan
     fell to $205 million—that is, a 1:2 *value to loan* ratio.  Com. ¶ 84.  This is backwards.  As Plaintiffs
28   themselves recognize, a margin call would be triggered if the *loan to value* ratio fell below 1:2—in

7

Here too, in other words, SunEdison truthfully disclosed the pertinent facts in its Q2 financial statements and accompanying notes:  Any margin call would need to be satisfied with cash.  The fact that the August 7, 2015 margin call *was* in fact duly satisfied with cash would have added little to the mix—and certainly nothing that would have reflected an "extreme departure" from the portrayal of SunEdison's financial condition in the August 6, 2015 financial statements.

Plaintiffs also cite Item 303 of Regulation S-K in support of their argument that SunEdison had a duty to update.  As previously noted, Plaintiffs did not refer in their complaint to any specific regulatory obligation to disclose the events of August 7 and August 11, 2015.  Mot. at 15.  In their brief, Plaintiffs now cite to a raft of regulatory provisions purportedly mandating disclosure of the margin call.  As suspected, their core allegation is that SunEdison should have disclosed the call under the provision of Item 303 relating to "known trends reasonably expect[ed] [to] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Opp. at 11 (citing 17 C.F.R. §229.303(a)(3)).  But Plaintiffs are wrong about this too.

Item 303 requires issuers to include an MD&A section in their offering materials.  17 C.F.R. §229.303 ("Management's Discussion and Analysis of Financial Conditions and Results of Operations").  The purpose of the requirement is to provide investors with an analysis of the company's financial statements from the unique perspective of management.  *See, e.g.*, SEC Interpretive Release Nos. 33-8350, 34-38960, FR-72 (2003).  SunEdison of course *did* include a detailed MD&A section in its offering materials.  Ex. C at 52-66.  Plaintiffs say that the discussion was inadequate because SunEdison failed to disclose a "worsening liquidity situation," in which the Company's "liquidity was rapidly diminishing even as its debt load was increasing."  Opp. at 12.  But as discussed, SunEdison did disclose its liquidity situation in the August 6, 2015 MD&A, stating, among other things, that "[w]e incurred a net loss," that "[o]ur total indebtedness . . . increased from $6,993 million as of December 31, 2014 to $10,722 million as of June 30 2015," and that "we have a working capital deficit of $252 million."  Ex. C at 60; *supra* at 4-5.

Plaintiffs argue that SunEdison had a duty to go beyond these disclosures and to identify the margin call itself as an independent "trend" over and above what it had identified in the MD&A.

other words, if the value of the collateral fell below $820 million.  Com. ¶ 76 & n.2.

1   Plaintiffs are wrong.  Courts have repeatedly held, as a matter of law, that even occurrences

2   spanning weeks or months are not of sufficient duration to constitute a trend.[7]  Critically, *no*

3   authority Plaintiffs cite holds that Item 303 mandates disclosure of a "trend" comprised of a single

4   event, occurring on a single date.[8]  Any such ruling would be contrary to the language and logic of

5   Item 303—not to mention unworkable for issuers and investors alike.

6          Plaintiffs finally contend that, under Item 303(a)(1), SunEdison was required to disclose the

7   margin call as an "event" that was reasonably likely to result in the Company's "liquidity increasing

8   or decreasing in any material way."  Opp. at 11 (quoting rule).  Plaintiffs cite no law holding that

9   issuers must disclose all such "events" *post-dating* the period covered by the financial statements to

10  which the MD&A relates.  This is not surprising, as such a requirement would be inconsistent both

11  with the central purpose of Item 303—which is to require management to provide an analysis *of its*

12  *financial statements*—and with the narrower duty to update recognized in the case law and in SEC

13  Rule 512, which applies only to extreme or fundamental changes.  *See* pages 3-4, above.  In short,

14  Item 303 does not support the broad-ranging duty to update that Plaintiffs seek to impose here.

   ### D.   SunEdison Had No Duty To Update The August 6, 2015 Disclosures To Reflect The August 11 Loan.

16         Much the same analysis applies to the August 11 Loan.  SunEdison disclosed both that it

17  had taken on extensive debt in Q2 2015 and that it intended to—and had already begun to—go to

18  the capital markets for extensive new borrowing in Q3 2015.  As noted, SunEdison projected that it

19  would need to raise an additional $5 billion—beyond its current indebtedness of $10.7 billion—in

20  order to fund its business plans.  *Supra* at 5.  SunEdison also described borrowing activities already

21  afoot in Q3 2015, including a $1 billion warehouse lending agreement and the sale of $810 million

---

22  [7] *E.g.*, *Coty*, 2016 WL 1271065, at *7 (collecting authorities); *Pearlstein v. Blackberry, Ltd.*, 2015

23  WL 1137519, at *10 (S.D.N.Y. Mar. 13, 2015) (two-month and five-month periods do not

    establish trends); *Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10

24  (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period of time does not establish a

    'trend' for purposes of the disclosures required by Item 303").

25  [8] Opp. at 11-12, citing *Silverstrand Inv. v. AMAG Pharm., Inc.*, 707 F.3d 95 (1st Cir. 2013) (Item

26  303 requires disclosure of 23 related events over a six-month period); *Schuh v. HCA Holdings,*

    *Inc.*, 947 F. Supp. 2d 882 (M.D. Tenn. 2013) (dismissing in part claims based on alleged Item 303

    violations, but concluding that allegation concerning two-month trend "barely survives dismissal");

27  *In re The Children's Place Sec. Litig.*, 1998 WL 35167284 (D.N.J. 1998) (applying *Shaw* and

    denying motion to dismiss where plaintiffs plausibly alleged that undisclosed sales trend indicated

28  that "the quarter would turn out to be an extreme departure from publicly-known trends").

of notes in its yieldco Global.  Mot. at 14.  The $169 million August 11 Loan was not an "extreme departure" from the disclosed fact that SunEdison's business depended on debt financing on a large and continuing scale.  Far from reflecting a departure from disclosed past and projected activities in this area, the August 11 Loan was *part of* those activities—and an exceedingly small part at that.

The fact that the August 11 Loan was consistent with SunEdison's disclosed financial condition and borrowing activities means that there was no duty to update here.  The fact that the loan was such a *small* part of those activities makes dismissal appropriate for a different reason.  As discussed in the opening brief, the August 11 Loan falls below the materiality threshold:  It constituted less than 1.5% of SunEdison's $10.7 billion disclosed indebtedness at the end of Q2 2015—and of course a still smaller fraction of the Company's debt as it continued to mount through the early part of Q3 2015 (and as the Company also disclosed).  Mot. at 14.  Because materiality is an element of both a Section 11 and a Section 12(a)(2) claim, this is fatal for Plaintiffs.[9]

Plaintiffs respond, as expected, by arguing that the interest rate on the August 11 Loan makes it material—that a loan made at an "effective" rate 14% over LIBOR would have signaled financial distress to investors, particularly insofar as other loans on SunEdison's balance sheet bore a lower interest rate.  Opp. at 21-22.  But as discussed in the opening brief, Plaintiffs are comparing apples and oranges.  During Q3 2015, the spread over LIBOR for second-lien loans like the August 11 Loan was 866.07 basis points.  Mot. at 14 n.5.  This yields an interest rate of more than 9.5%, which is in keeping with the 9.25% rate SunEdison paid; meanwhile, Plaintiffs allege no facts suggesting that a comparison to other loans SunEdison disclosed is even relevant.  *Id.*

[9] Plaintiffs contend that issues of materiality should not be decided on a motion to dismiss.  Opp. at 19-20.  But courts often dismiss securities actions on materiality grounds.  *E.g., Dekalb Cty. Emps. Ret. Sys. v. Controladora Vuela Compania De Aviacion, S.A.B.*, 2016 WL 3685089, at *3-4 (S.D.N.Y. July 6, 2016) (dismissing complaint where alleged misstatement related to 1.46% of the company's quarterly revenues); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 545-49 (8th Cir. 1997); *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004); *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *8-9 (N.D. Ill. Nov. 14, 2000).  Plaintiffs' authorities do not mandate a different result here.  In Plaintiffs' principal case, *Litwin v. Blackstone Group*, 634 F.3d 706 (2d Cir. 2011), the Second Circuit *acknowledged*, citing authorities, that as an initial matter, imposing a numerical threshold of 5% is a sound approach to materiality.  *Id.* at 717.  The court also held that in certain cases, qualitative factors may make even quantitatively insignificant information material.  *Id.*  In the present case, however, the relevant qualitative factors were not hidden but disclosed.  SunEdison made clear to investors that it was dependent on external sources to maintain liquidity, and that it could not ensure that it would be able to borrow funds on favorable terms.  *See* page 5, above.

Plaintiffs also challenge the admissibility of Defendants' interest-rate data, but as shown in the RJN Reply (filed together with this brief), courts routinely take notice of such data compilations from authoritative sources.[10]

Finally, even assuming that the terms of the August 11 Loan were somehow uniquely unfavorable, this too would have been consistent with the facts disclosed to the market.  As discussed, SunEdison's financial statements disclosed that the Company was operating at a loss, that it was heavily indebted, and that its business plan depended on additional debt financing.  As a matter of common business sense, lenders would impose terms that compensated them for the risk of doing business with borrowers in this situation.  Indeed, that is exactly what Plaintiffs themselves were doing.  Investors purchase preferred stock of the type at issue here—stock that comes with a liquidation preference and rights to quarterly dividend payments—when a company's financial condition may not be sufficiently stable to attract a pure equity investment.  By purchasing preferred stock, Plaintiffs themselves did the same thing as the counterparty to the August 11 Loan: They parted with capital on terms designed to protect themselves against—and compensate themselves for—SunEdison's known liquidity risks.  The fact that similar terms were  part of the August 11 Loan can have come as no surprise; certainly it did not reflect an extreme departure from the Company's known financial condition.

### E.   Plaintiffs Plead No Facts Showing That The Affirmative Statements In The Offering Materials Were False or Misleading.

For all of the heft of the complaint, Plaintiffs challenge relatively few statements.  Plaintiffs now concede that the allegedly false statements in the lengthy background section of the complaint are inactionable under Sections 11 and 12(a)(2).  Opp. at 23.  Plaintiffs' claims thus reduce to six statements or passages in SunEdison's offering materials, set forth in six paragraphs of the complaint:  ¶ 124 (discussion of liquidity); ¶ 127 (description of the Margin Loan); ¶ 129 (underwriting relationships); ¶ 132 (Recent Developments); ¶ 134 (overview of business); and ¶ 136 (Use of Proceeds).[11]  We address these statements in reverse order below, and briefly explain

---

[10] As to the second component of the "effective" interest rate of 15%—a $9 million origination fee—the Individual Defendants pointed out in the opening brief that Plaintiffs have pled no facts suggesting that this was anything other than customary.  *Id.*  Plaintiffs do not respond to this point.

[11] The statements in ¶¶ 124, 127 and 134 are contained in the August 6, 2015 Form 10-Q; the

1  why, in addition to the reasons discussed above, none supports a claim.

2      ***Use of Proceeds, ¶ 136.***  As discussed in the opening brief, SunEdison described its

3  intended use of the proceeds of the Preferred Stock Offering very broadly:  The Company said that

4  it would use the capital for "general corporate purposes."  Mot. at 12-13.  Plaintiffs cannot and do

5  not dispute that paying down debt—the use to which they allege the proceeds were put—comes

6  within that broad description.  Plaintiffs argue that the description was nevertheless misleading

7  because they believed SunEdison would use its capital to "provide flexibility to take advantage of

8  possible future opportunities" rather than to "meet existing liquidity requirements."  Opp. at 22-23.

9  Even if Plaintiffs could identify a basis for this alleged belief—and they cite nothing in the

10  challenged passage that supports it—the claim would fail because "general corporate purposes"

11  plainly encompasses *both* current liquidity needs and future opportunities.

12      ***Overview of Business, ¶ 134.***  The challenged statements concerning SunEdison's business

13  plans are similarly general.  SunEdison stated that during Q2 2015, it continued execution of its

14  business strategy, which was designed to address its most significant risks and opportunities.  In

15  seeking to convert this general statement into something sufficiently specific to support a

16  misrepresentation claim, Plaintiffs have imported into it words that simply are not there:  Plaintiffs

17  say that SunEdison represented that its business strategy "*would permit*" it to reach its goals.  Opp.

18  at 25.  But SunEdison did not say this; it said only that its business strategy was "designed to"

19  address certain risk and opportunities.  Com. ¶ 134.  Even more egregiously, Plaintiffs accuse

20  SunEdison of telling investors that its "business strategy was intact and on track."  Opp. at 25.  But

21  nothing approaching these words, in form or the substance, appears in the statement SunEdison

22  actually made.  Com. ¶ 134.

23      In the opening brief, the Individual Defendants cited authority holding that broad statements

24  of corporate intention or optimism are too general to be actionable because they are too general to

25  be false or misleading.  Mot. at 19-20.  Plaintiffs' response is simply to rewrite the statement they

26  challenge.  But that plainly cannot solve their problem.  A Securities Act claim must be grounded

27  on the statements the issuer actually makes, not statements plaintiffs later make up in litigation.

28  statements in ¶¶ 129, 132 and 136 are contained in the Prospectus itself.

*Recent Developments, ¶ 132.*  Plaintiffs say little about their challenge to the "Recent Developments" discussion in the Prospectus—only that it "appeared to provide a detailed, and apparently complete, disclosure of SUNE's recent borrowing arrangements and other circumstances bearing on its liquidity."  Opp. at 20.  As the authorities discussed above make clear, an issuer's duty to disclose financial data related to the quarter in progress is limited by the "extreme departure" standard.  Beyond that, there is no general duty to provide a complete account of recent activity.  Mot. at 5-6 (citing authorities).

*Underwriting Relationships, ¶ 129.*  For the first time in their opposition, Plaintiffs contend that Item 508(a) of Regulation S-K required SunEdison to disclose the August 11 Loan.  Opp. at 11.  But that rule requires only a "brief[ ]" statement describing the "nature" of material relationships with underwriters.  17 C.F.R. § 229.508(a).  The rule does not require the disclosure of every transaction between an issuer and its underwriters, which would be unworkable.  SunEdison satisfied the rule.  The offering documents clearly described the nature of the Company's material relationships, and specifically listed a commitment for a $500 million term loan with Goldman Sachs Bank, as well as a further commitment between Goldman Sachs Bank and one of SunEdison's affiliates relating to a $960 million unsecured bridge loan.  Ex. A at S-68.

Plaintiffs contend that because the August 11 Loan was not also listed, SunEdison "conceal[ed] conflicts of interest with the underwriters . . . [who] had an interest in assuring that the Offering was completed to prevent further deterioration."  Opp. at 22.  To the extent that a lending relationship with underwriters constitutes a conflict of interest, SunEdison revealed it.  Investors knew that Goldman Sachs had committed to make loans to SunEdison and its affiliates far in excess of the $169 million August 11 Loan.  The existence of the additional smaller loan would not have materially altered the analysis.[12]

*Margin Loan Description, ¶ 127.*  Plaintiffs argue that an investor reading the description of

---

[12] Plaintiffs argue that the $169 million August 11 Loan must have been material because SunEdison disclosed a smaller loan—$150 million—from Deutsche Bank.  Opp. at 20.  But the fact that the latter transaction was disclosed does not impose an obligation to disclose all other transactions.  In any event, as Plaintiffs stress, materiality is contextual.  Taken as a whole, the underwriting discussion in the Prospectus clearly informed investors of interests and incentives that the underwriters generally, and Goldman Sachs in particular, had outside of the underwriting relationship.

the Margin Loan in SunEdison's Q2 2015 financial statements would mistakenly conclude that no margin call had been made at the time of the August 18 offering.  Opp. at 16-17.  Here, Plaintiffs reckon without either the relevant chronology or the legal framework on which they themselves rely—namely, the law governing an issuer's duty to update.  Given the timing of the disclosures and the relevant law, a reader would in reality conclude (1) that no margin call had been made during the period covered by the Q2 2015 financial statements—which ended June 30, 2015, and (2) that during the quarter in progress, no margin call representing an extreme departure from SunEdison's previously disclosed financial condition had been made.  Plaintiffs plead no facts suggesting that either of these conclusions would have been wrong.

*Liquidity Discussion, ¶ 124.*  Finally, Plaintiffs challenge the discussion of liquidity in the MD&A accompanying SunEdison's Q2 2015 financial statements.  Like the other challenged statements, this discussion does not conceal but reveals the critical facts—that while management believed SunEdison's liquidity would be sufficient to support its operations, the Company was dependent on additional external financing, and that no assurance could be made that the Company would be able secure it.  Ex. C at 60.  Plaintiffs complain that the discussion was nevertheless misleading insofar as SunEdison described as contingencies events that were already occurring; specifically, Plaintiffs say that SunEdison had already "breached the covenants on the Margin Loan."  Opp. at 9, 24.  But even if the events triggering a margin call constitute the "breach" of a "covenant"—and they do not—Plaintiffs would be wrong.  Plaintiffs again neither contend that the events at issue occurred during the period covered by the Q2 2015 financial statements, nor plead facts showing that those events constituted an extreme departure sufficient to trigger a duty to update.  Here too, Plaintiffs' claims fail under the very legal framework they invoke.

### F.  Plaintiffs Plead No Facts Showing That The Individual Defendants Can Be Liable As Sellers Under Section 12(a)(2).

As the Individual Defendants showed in the opening brief, courts have repeatedly held that persons who participate in routine offering activities do not by that means become Section 12(a)(2) sellers.  Mot. at 21 (citing authorities).  In response, Plaintiffs cite aging district court decisions for the proposition that simply signing a registration statement confers seller status.  Opp. at 27 n.22

1  (citing decisions from within the Ninth Circuit dated 1994, 1999 and 2003).  This does not

2  overcome the weight of authority.  *Every* circuit court that has ruled on the issue has held that

3  signing a registration statement does not make a person a seller; more recent district court decisions

4  from within the Ninth Circuit hold the same.[13]

5      Plaintiffs also contend that even if signing the registration statement is not enough,

6  participation in other routine activities is.  Opp. at 28.  Circuit-level law again holds otherwise:  A

7  defendant is not liable as a Section 12(a)(2) solicitor unless that defendant has "at a minimum

8  directly communicate[d] with the buyer"—something Plaintiffs do not allege here.  *Rosenzweig*,

9  332 F.3d at 871; *Craftmatic*, 890 F.2d at 136.  While Plaintiffs cite to decisions from the Southern

10 District of New York that have reached a different conclusion, district courts within the Ninth

11 Circuit follow the *Rosenzweig* approach.[14]  Plaintiffs offer no reason why this Court should part

12 ways with the many others that have held, as a matter of law, that activities indistinguishable from

13 those alleged here do not convert the officers and directors of an issuer into statutory sellers.

14 **III.  CONCLUSION**

15     For all of the reasons stated, the Court should dismiss the complaint in its entirety.

16 DATED: July 29, 2015                    Respectfully submitted,

17                                          SIDLEY AUSTIN
                                           /s/ Sara B. Brody
18                                          _____
                                            Sara B. Brody
19                                          Attorneys for the Individual Defendants

20

21

22

---

23 [13] *Shaw*, 82 F.3d at 1216; *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989);  *Maine State Ret. Sys. v.*
24 *Countrywide Fin. Corp.*, 2011 WL 4389689, at *9-10 (C.D. Cal. May 5, 2011); *Fouad v. Isilon Sys.*, 2008 WL 5412397, at *7 (W.D. Wash. Dec. 29, 2008).  Several of Plaintiffs' own authorities
25 hold the same. *In re Stratosphere Corp. Sec. Litig.*, F. Supp. 2d 1096, 1120 (D. Nev. 1998); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 403 (S.D.N.Y. 2013).

26 [14] *See e.g.*, *Maine State*, 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011) ("Even participation in road shows to promote the sale of stock does not constitute active solicitation under *Pinter*");
27 *Isilon*, 2008 WL 5412397, at *7 ("common issuer activity" is insufficient); *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2012 WL 1322884, at *5 (C.D. Cal. Apr. 16, 2012)
28 (dismissing claims where plaintiffs failed to allege a "direct relationship" with defendants).

By:    /s/ Lisa Li
       Lisa Li, SBN 260474
       WILMER CUTLER PICKERING
       HALE AND DORR LLP
       950 Page Mill Road
       Palo Alto, California 94304
       Telephone: (650) 858-6000
       Facsimile (650) 858-6100
       Lisa.Li@wilmerhale.com

       Michael Bongiorno (admitted *pro hac vice*)
       Timothy Perla (admitted *pro hac vice*)
       WILMER CUTLER PICKERING
       HALE AND DORR LLP
       60 State Street
       Boston, Massachusetts 02109
       Telephone: (617) 526-6000
       Facsimile (617) 526-5000
       Michael.Bongiorno@wilmerhale.com
       Timothy.Perla@wilmerhale.com

       *Attorneys for Peter Blackmore*

**SIGNATURE ATTESTATION**

I am the ECF User whose identification and password are being used to file the foregoing document.  In compliance with Civil L.R. 5-1, I hereby attest that the signatory has concurred in this filing.

Dated:  July 29, 2016                     Respectfully Submitted,

By:   */s/* Sara B. Brody
      Sara B. Brody, SBN 130222
      SIDLEY AUSTIN LLP
      555 California Street, Suite 2000
      San Francisco, California  94104
      Telephone:  (415) 772-1200
      Facsimile:  (415) 772-7400
      sbrody@sidley.com

*Attorneys for SunEdison, Inc., Ahmad Chatila, Brian Wuebbels, Antonio Alvarez, Emmanuel Hernandez, Steven Tesoriere, Clayton Daley, Jr., James Williams, Georganne Proctor, and Randy Zwirn*